1  Ryan G. Baker (Bar No. 214036)
     rbaker@bakermarquart.com
2  Brian Grace (Bar No. 307826)
     bgrace@bakermarquart.com
3
   Emily R. Stierwalt (Bar No. 323927)
4    estierwalt@bakermarquart.com
5  BAKER MARQUART LLP
   777 S. Figueroa St., Suite 2850
6  Los Angeles, California 90017
7  Telephone: (424) 652-7800
   Facsimile: (424) 652-7850
8
9  *Attorneys for Plaintiffs*

10              **UNITED STATES DISTRICT COURT**

11       **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

12

| | |
|---|---|
| INTERNATIONAL MEDICAL DEVICES, INC., a corporation organized under the laws of California; MENOVA INTERNATIONAL, INC., a corporation organized under the laws of California; and JAMES ELIST, MD, an individual, | Case No. 2:20-cv-03503-CBM (RAOx) **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** |

13
14
15
16
17                    Plaintiffs,

18              v.

19  ROBERT CORNELL, MD, an
    individual; AUGMENTA, LLC, a
20  corporation organized under the laws of
    Delaware; ROBERT J. CORNELL,
21  M.D., P.A., a professional association
22  organized under the laws of Texas;
    JONATHAN CLAVELL, MD, an
23  individual; CLAVELL UROLOGY,
    PLLC, a professional limited liability
24  corporation organized under laws of
25  Texas; and DOES 1 through 10,
    inclusive,
26
27                    Defendants.

28

Judge: Hon. Consuelo B. Marshall

Date: November 10, 2020
Time: 10:00 a.m.
Courtroom: 8B

Filed concurrently herewith:
Declarations of James Elist, MD;
Jonathan Elist; Duncan Louie; Edward
Leicht; Jan Varner; Minerva Acosta;
Brian Grace; and [Proposed] Order

**[REDACTED VERSION FOR PUBLIC FILING]**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 10, 2020, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Consuelo B. Marshall, at the United States District Court for the Central District of California, First Street Courthouse, 350 W. 1st Street, Courtroom #8B, Los Angeles, California 90012, Plaintiffs International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova") and James Elist, MD (collectively, "Plaintiffs"), shall move and hereby do move the Court for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65.

Plaintiffs' motion seeks the following forms of injunctive relief, pursuant to Federal Rule of Civil Procedure 65, and order prohibited any Defendant from:

- Using or disclosing Plaintiffs' proprietary, confidential, or trade secret information, including any of Plaintiffs' contemplated improvements to the Penuma cosmetic penile implant such as the use of (1) internal pockets or voids of space to increase softness; (2) use of mesh tabs coupled in or around the distal tip of the implant; and (3) use of absorbable sutures in coordination with the mesh tabs;

- Representing by any means whatsoever that Augmenta is associated with Plaintiffs, and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of consumers as the origin or sponsorship of such products;

- Doing any other acts or things calculated or likely to cause confusion or mistake in the minds of the consuming public or to lead consumers to believe that Augmenta comes from Plaintiffs or is somehow sponsored or licensed by, or associated with or affiliated with, Plaintiffs or Penuma;

- Making any false or misleading statements in connection with Augmenta;

- Further commercialization of the Augmenta implant;
- Commercializing, or in any other manner, marketing, developing, promoting, and/or profiting from Plaintiffs' proprietary, confidential, and trade secret information, including the U.S. Patent No. 10413413 ("'413 Patent") and Patent Application No. 16/238,821 ("'821 Application");
- Pursuing, or continuing to prosecute, any domestic or international patent applications or regulatory submissions, including any pending Food and Drug Administration 510(k) submission, for clearance or approval that involve Plaintiffs' proprietary, confidential, or trade secret information.
- Operating, owning, promoting, advertising, marketing and/or utilizing the Penuma mark and prohibiting any defendant from using the Penuma mark as a keyword to drive Internet traffic to defendants' websites; and
- Otherwise unfairly competing with Plaintiffs.

This Motion is made following the conference of counsel which took plance on June 2, 2020. (Declaration of Brian Grace in support of Plaintiffs' Motion for Preliminary Injunction ("Grace Dec."), ¶ 33. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the supporting declarations of Dr. James Elist, Jonathan Elist, Edward Leicht, Jan Varner, Duncan Louie, Minerva Acosta, and Brian Grace, with accompanying exhibits to each declaration, all the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court before its ruling.

Dated:  October 6, 2020            BAKER MARQUART LLP

By: _/s/ Ryan G. Baker_ _____

Ryan G. Baker
*Attorneys for Plaintiffs,*
*INTERNATIONAL MEDICAL DEVICES,*
*INC., MENOVA INTERNATIONAL, INC.,*
*and JAMES ELIST, M.D.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT OF FACTS ......................................................................... 3

    A.    A. Dr. James Elist Invents Penuma ...................................... 3

    B.    B. Plaintiffs' Efforts Establish Penuma as the Market Leader .............. 3

    C.    C. Dr. Elist Develops Trade Secrets for Possible Improvement of Penuma ........................................................................... 4

    D.    D. Plaintiffs' Considerable Efforts to Protect Trade Secrets ................ 6

    E.    E. Dr. Cornell Requests Penuma Training .................................. 6

    F.    F. Dr. Cornell Visits, Signs the Penuma NDA, Learns Trade Secrets ...................................................................... 7

    G.    G. Days after Dr. Cornell's Penuma Training, He Begins Developing a Competing Cosmetic Penile with Penuma Trade Secrets ...................................................................... 8

    H.    H. Cornell Misrepresents Himself as a Penuma Implant Specialist While Secretly Developing Augmenta With Plaintiffs' Trade Secrets ............................................................. 10

    I.    I. Dr. Cornell Solicits Augmenta, LLC investment and Disparages Penuma ......................................................... 12

    J.    J. Based on Plaintiffs' Trade Secrets Augmenta, LLC Receives A Patent ........................................................................ 13

    K.    K. Augmenta, LLC Applies for FDA Clearance Using Plaintiffs' Confidential Designs and Prematurely Advertises ............................... 14

    L.    L. Defendants Confuse Patients in the Cosmetic Penile Implant Market ....................................................................... 15

ARGUMENT ......................................................................................... 16

    A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....... 16

        1.    Plaintiffs Will Succeed on Their Trade Secrets Claims ............. 16

        2.    Defendants Misappropriated Plaintiffs' Trade Secrets ............. 16

        3.    Defendants Acquired Trade Secrets Through Improper Means ................................................................ 18

B.     Plaintiffs Will Succeed on Their Trademark Infringement Claims......20

    1. Plaintiffs Own the Penuma Mark ...................................................21

    2. Defendants Used the Penuma Mark Without Authorization .........21

    3. Defendants Caused Confusion Using the Penuma Mark ..............22

C.    PLAINTIFFS HAVE SUFFERED IRREPARABLE HARM..............23

D.    OTHER FACTORS FAVOR INJUNCTIVE RELIEF WITH NO BOND ........................................................................................................24

CONCLUSION....................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 16

*Altavion, Inc. v. Konica Minolta System Laborataory, Inc.*,
    226 Cal. App. 4th 26 (2014) .................................................................. 17

*BladeRoom Group Ltd. v. Emerson Electric Co.*,
    331 F. Supp. 3d 977 (N.D. Cal. 2018) ............................................... 18, 19

*Comet Technologies United States of America Inc. v. Beuerman*,
    18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal., Mar. 15, 2018) ................. 25

*Dreamwerks Product Group, Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ............................................................... 22

*Finance Express LLC v. Nowcom Corp.*,
    564 F. Supp. 2d 1160 (C.D. Cal. 2008) ..................................................... 2

*Henry Schein, Inc. v. Cook*,
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) .................................................. 25

*Herb Reed Enterprises, LLC v. Florida Entertainment Management,
    Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ............................................................... 24

*Independent Technologies, LLC v. Otodata Wireless Network, Inc.*,
    2020 WL 1433525 (D. Nev., Mar. 23, 2020) .......................................... 25

*Kittrich Corp. v. Chilewich Sultan, LLC*,
    No. CV1210079GHKARGX, 2013 WL 12131376 (C.D. Cal., Feb.
    20, 2013) ............................................................................................ 18

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions , Inc.*,
    658 F.3d 936 (9th Cir. 2011) ................................................................. 21

*Mattel, Inc. v. MGA Entertainment, Inc.*,
    782 F. Supp. 2d 911 (C.D. Cal. 2011) .................................................... 17

*Nissan Motor Co. v. Nissan Computer Corp.*,

378 F.3d 1002 (9th Cir. 2004) ................................................................... 23

*Ossur hf v. Manamed Inc.*,
331 F. Supp. 3d 1005 (C.D. Cal 2017) ....................................................... 21

*Pacific Aerospace & Electronics, Inc. v. Taylor*,
295 F. Supp. 2d 1188 (E.D. Wash. 2003) ................................................. 23

*Phillip Morris USA, Inc. v. Shalabi*,
352 F. Supp. 2d 1067 (C.D. Cal. 2004) .................................................... 22

*Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*,
149 F.3d 722 (7th Cir.1998) ...................................................................... 21

*Polo Fashions, Inc. v. Craftex, Inc.*,
816 F.2d 145 (4th Cir. 1987) .................................................................... 22

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) .................................................................... 1

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) .................................................................... 22

*Transgo, Inc. v. AJAC Transmission Parts Inc.*,
768 F.2d 1001 (9th Cir. 1985) .................................................................. 22

*Tri-Tron International v. Velto*,
525 F.2d 432 (9th Cir. 1975) .................................................................... 18

*UniRAM Technology, Inc. v. Taiwan Semiconductor Manufacturing
Co.*, No. C 04-1268 VRW, 2008 WL 11515597 (N.D. Cal., Apr. 17,
2008) .......................................................................................................... 18

*United States v. Chung*,
659 F.3d 815 (9th Cir. 2011) .................................................................... 17

*Waymo v. Uber Technolgies, Inc.*
No. C 17-00939 WHA, 2017 WL 2123560 (N.D. Cal., Mar. 2,
2018) .......................................................................................................... 25

*WeRide Corp v. Kun Huang*,
379 F. Supp. 3d 843 (N.D. Cal. 2019) ................................................ 16, 25

*WHIC LLC v. NextGen Laboratories, Inc.*,

341 F. Supp. 3d 1147 (D. Haw. 2018) ................................................................24

*Williams-Sonoma, Inc. v. Amazon.com, Inc.*,
  No. 18-CV-07548-EDL, 2019 WL 7810815 (N.D. Cal., May 2,
  2019) ..............................................................................................................23

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ...........................................................................................16

**Statutes**

Cal. Civ. Code § 3426.1................................................................................16, 18

15 U.S.C.§ 1114(1) ...............................................................................................21

15 U.S.C § 1115(a) ................................................................................................21

18 U.S.C.§ 1836.....................................................................................................16

18 U.S.C.§ 1839............................................................................................16, 18

18 U.S.C.A.§ 1839........................................................................................16, 18

**Other Authorities**

U.S. Patent No. 6,537,204 ..............................................................................13, 14

U.S. Patent No. 10413413 ..................................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Dr. James Elist invented Penuma based on decades of urological surgery experience.  At this time, Penuma is the only FDA-cleared cosmetic penile implant.  While the current Penuma device is protected by several U.S. patents, Plaintiffs have developed trade secrets related to changes in the device and to the Penuma implant procedure.  Plaintiffs protect these trade secrets in several ways.  Documents reflecting Plaintiffs' trade secrets are maintained in a locked file; Plaintiffs conduct regular intellectual property audits; and Plaintiffs require that all third parties agree to confidentiality/non-disclosure prior to learning any non-public information about Penuma.  In spite of these precautions, Defendants[1] misappropriated several of Plaintiffs' trade secrets to create a competing product.  In furtherance of their scheme to confuse the marketplace and offer their product in place of Penuma, Defendants also infringed Plaintiffs' trademark and copyright.  For all these reasons, a preliminary injunction is appropriate.

Plaintiffs are likely to succeed on the merits of their claims.  In early 2018, defendant Dr. Robert Cornell expressed an interest in Penuma training.  Dr. Elist invited Cornell to observe several Penuma implant procedures at Dr. Elist's Beverly Hills surgery center.  Cornell signed the Penuma NDA while at Dr. Elist's surgery center on March 30, 2018.  During his visit, Cornell asked numerous questions about the Penuma design and future plans.  Relying on the NDA, Dr. Elist answered Cornell's questions.  However, within days of the training, Cornell breached the NDA, disclosing trade secrets he had learned from Dr. Elist to Cornell's business partners in a venture to compete with Penuma.

Cornell later disclosed Defendants' trade secrets in filings with the U.S.

---

[1] Defendants in this action are Dr. Robert Cornell and his professional association, Robert J. Cornell, MA, PA (together, "Cornell"), his associate Dr. Jonathan Clavell and his professional association, Clavell Urology, PLLC ("Clavell"). Augmenta LLC is managed by Cornell and part owned by Clavell.

Patent and Trademark Office, submitted within four months of Cornell's visit to Dr. Elist's surgery center. Cornell and his partners obtained a patent to compete with Plaintiffs' Penuma implant based entirely on Plaintiffs' trade secrets. Defendants named their implant "Augmenta." Not coincidentally, among the interest holders in Augmenta is Dr. Run Wang. Wang had been a member of Penuma's advisory board, and was subject to a Penuma non-disclosure agreement, but had apparently also become Defendants' second source of Penuma's confidential information. Defendants had an alternate route to Penuma trade secrets.

Defendants also repeatedly used the Penuma trademark without authorization. Cornell and Dr. Jonathan Clavell each repeatedly incorporated the Penuma mark in their internet advertising campaigns. Plaintiffs sent multiple cease and desist letters, but Defendants' campaign to confuse through trademark infringement did not appear to have ceased until well after this litigation commenced. Defendants' marketing was designed to confuse customers and divert them from Penuma to Augmenta. Customers were confused, and, when at least one customer responded to Cornell's Penuma advertisement, he offered Augmenta instead. Not yet cleared or approved by the FDA, Augmenta cannot lawfully be advertised or offered for sale. This has not stopped Defendants – the Augmenta website has been up with images of the Augmenta device, pricing, and other information; this is not permitted absent FDA approval or clearance.

Unauthorized disclosure and commercialization of Penuma's trade secrets and other intellectual property has, and continues to, irreparably harm Plaintiffs. Moreover, Defendants' trademark infringement continues to harm Plaintiffs' goodwill. That infringement deprives Plaintiffs of any equitable excuse. Similarly, because Plaintiffs only seek to enforce laws designed to protect intellectual property, public interest also favors a preliminary injunction. The Court should grant this motion in its entirety and preliminarily enjoin Defendants from further infringement, misappropriation and/or efforts to commercialize Augmenta.

## STATEMENT OF FACTS

**A.  Dr. James Elist Invents Penuma**

Plaintiff Dr. James Elist is a renowned urologist and pioneer in the field of aesthetic and reconstructive urology.  (October 6, 2020 Declaration of James Elist, MD ("Dr. Elist Dec."), ¶ 1.)  He is the holder of multiple patents on cosmetic silicone penile implants designed to expand the size of a penis by facilitating tissue expansion and preventing penile retraction.  (*Id*. ¶ 2.)  These patents protect Penuma, the first penile implant for cosmetic correction cleared by the United States Food and Drug Administration ("FDA").  (*Id.*, ¶¶ 2-4.)  Plaintiff International Medical Devices, Inc. ("IMD") distributes Penuma to approved surgeons.   (*Id.*, ¶ 6.)

Menova International, Inc. ("Menova") holds intellectual property related to Penuma, including the registered Penuma trademark.  (Dr. Elist Dec., ¶ 4, Ex. A.) Since January 2016, Plaintiffs[2] have continuously used the name "Penuma" in commerce to refer to Dr. Elist's subcutaneous silicone penile implant.

In 2004, the FDA cleared what is now known as Penuma for commercial use, deeming it safe for use.  (*Id.* ¶ 5. )  Following certain design changes, Penuma has received further clearance from the FDA in 2017 and 2019.  (*Id.*)  Penuma remains the only FDA-cleared cosmetic penile implant.  (*Id.*)

**B.  Plaintiffs' Efforts Establish Penuma as the Market Leader**

Plaintiffs have spent years building the Penuma brand and reputation.  Today, Penuma is the cosmetic penile implant market leader; in recent years, demand for Penuma has increased significantly.  (Dr. Elist Dec., ¶ 7.)  This position did not come without significant effort.  Plaintiffs spent years developing Penuma, and they have continued to develop improvements, based on clinical and other observations during thousands of Penuma implant procedures.  (*Id.* ¶ 7 Ex. B.)

Plaintiffs promote Penuma on their websites, brochures, and other

---

[2] Plaintiffs Dr. Elist, IMD and Menova referred to collectively as "Plaintiffs."

promotional materials, including informational videos designed to explain the product and procedure to potential patients.  (Dr. Elist Dec., ¶ 11.)  Plaintiffs also support clinical study of Penuma.  (*Id.* ¶¶ 8-9.)  In July 2018, The Journal of Sexual Medicine, a peer-reviewed medical journal, published a five-year study on over 400 Penuma patients, concluding Penuma is safe and effective and "[d]evice removals attributed to an adverse event are few, and subjects reported improved self-confidence and high levels of long-term satisfaction." (*Id.*, Exs. C, D.)  Also, on April 3, 2019, the International Journal of Impotence Research concluded Penuma has "a possible therapeutic use of helping . . . with retractile penis." (*Id.*, Ex. E.)

Penuma has been widely recognized as safe, effective, and designed to minimize risk to the patient.  (See, e.g., *Id.*, Exs. B-C.)  Penuma's proven track record and Plaintiffs' promotional efforts have helped rehabilitate the public perception of cosmetic penile enhancement, which has a history of unsafe and dangerous procedures.  (*Id.* ¶ 10.)  Penuma is now well known in the industry as a safe option for cosmetic penile augmentation.  (*Id.* ¶ 11.)

**C.    Dr. Elist Develops Trade Secrets for Possible Improvement of Penuma**

Dr. Elist has spent years developing confidential design ideas to possibly improve Penuma.  (Dr. Elist Dec., ¶ 13.)  Dr. Elist produced these ideas based on his unique experience with cosmetic penile implants.  (*Id.*)  Plaintiffs invested significant time, effort, and resources working with engineers to create and develop prototypes based on Dr. Elist's trade secret ideas.  (*Id.* ¶¶ 13-20; Declaration of Jonathan Elist ("J. Elist Dec."), ¶ 5.)  In addition to the surgical instrument list, three of plaintiffs' implant design trade secrets are at issue: 1. Internal pockets in the implant; 2. Mesh tabs for implantation; and 3. Absorbable sutures.

In 2008, Dr. Elist first thought of including internal pockets or voids of space to soften the currently solid silicone body of Penuma.  (Dr. Elist Dec., ¶ 14.)  Dr. Elist recognized that Penuma caused some buckling in certain Penuma patients with very small penises and thinner skin.  (*Id.*)  Dr. Elist realized these patients could

benefit from a softer implant.  (*Id.*)  He intended to use internal pockets or voids of space in the silicone to increase Penuma's flexibility and elasticity by modulating its hardness.  (*Id.*)  During the same time frame, Dr. Elist, based on his clinical experience, also began to consider the incorporating of mesh tabs into certain portions of the Penuma implant, including the distal tip.  (*Id.*)  These tabs would hold the implant in place, which would also facilitate absorbable sutures.  These changes would particularly benefit patients with very small penises.  (*Id.*)

In late 2008, Dr. Elist first discussed these ideas with Jan Varner, CEO of Specialty Surgical Products, Inc. ("SSP"), the medical device manufacturer Dr. Elist used to develop the first Penuma implant.  (*Id.*, ¶ 15.)  Dr. Elist and SSP discussed these plans for future versions of Penuma but did not finish them.  (Dr. Elist Dec. ¶ 15; Declaration of Jan Varner ("Varner Dec."), ¶¶ 5-7.)   Dr. Elist elected to focus his efforts on obtaining new FDA clearance that would enable him to commercialize Penuma.  (Dr. Elist Dec. ¶ 15.)  At the time he was the only surgeon to implant Penuma.  (*Id.*)  His aimed to expand Penuma's reach, which required additional FDA clearance, but he was committed to Penuma's ongoing improvement.  (*Id.*)

In early 2017, Dr. Elist resumed discussions for inclusion of internal pockets and mesh tabs with Plaintiffs' new contract manufacturer Implantech Associates, Inc. ("Implantech").  (Dr. Elist Dec., ¶¶ 16-17; Declaration of Ed Leicht ("Leicht Dec."), ¶ 4.)  On March 8, 2017, Dr. Elist and Jonathan Elist met with Implantech's General Manager and its Director of Engineering and Facilities to share Dr. Elist's ideas for design concepts he wanted to test for potential use in future versions of Penuma.  (Dr. Elist Dec., ¶ 17; Leicht Dec. ¶ 4; J. Elist Dec., ¶ 4.)  During the meeting, they discussed the integration of mesh tabs onto the implant, particularly in and around the distal tip, to help secure the implant.  (*Id.*) They also discussed inclusion of internal pockets or voids of space in the body of the implant, which Dr. Elist explained where designed to make a version of Penuma that was softer and more flexible. (*Id.*) Notes from the meeting reflect these design ideas.  (Leicht Dec.,

1   Ex. A, J. Elist, Ex. A, Dr. Elist Dec., Ex. G.)  Implantech created prototypes of

2   implants incorporating these features.  (Leicht Dec., ¶ 5, Ex. B; Dr. Elist Dec., Ex.

3   J.)  Plaintiffs continue to work with designers on these new features. (Dr. Elist ¶ 19.)

4         In addition to the design trade secrets, Dr. Elist has, over many years,

5   developed a unique list of surgical instruments and materials for use during a

6   Penuma implant procedure.  (*Id.* ¶ 20.)  This list includes instruments not typically

7   used in the field of urology to ensure Penuma is implanted in patients safely and

8   effectively.  (*Id.*)  Dr. Elist also developed ways to modify the surgical technique,

9   including the use of absorbable sutures to secure the mesh tabs in place. (*Id.*)

10  **D.    Plaintiffs' Considerable Efforts to Protect Trade Secrets**

11        Plaintiffs follow a strict protocol for maintaining confidential and proprietary

12  information.  IMD has a standard operation procedure with respect to trade secret

13  protection.  (Dr. Elist. Dec. ¶ 21, Ex. K.)  IMD physically segregates trade secret

14  documents and prototypes in a locked file and conducts routine trade secret audits.

15  (*Id.*)  All third parties must sign non-disclosure and confidentiality agreements

16  before exposure to any of Plaintiffs' trade secrets.  (*Id.*, ¶ 22.)  For instance, IMD

17  entered into confidentiality agreements with both device manufacturing firms he

18  worked with on Penuma.  (Dr. Elist Dec., ¶ 16, Exs. G, H, Varner Decl., ¶ 4; Leicht

19  Dec., ¶ 3.)  Likewise, Plaintiffs required the sole distributor of Penuma, Gesiva,

20  LLC ("Gesiva"), to enter confidentiality agreements.  (Dr. Elist Decl. ¶ 22, Ex. L.)

21        In October 2017, IMD recruited renowned urologists to serve as members of

22  an advisory board to help develop a Penuma training program.  (*Id.*, ¶ _.)  IMD

23  required all advisory board members to accept a strict confidentiality term.  (*Id.*) All

24  surgeons must enter a non-disclosure agreement before any Penuma training.  (*Id.*)

25  **E.    Dr. Cornell Requests Penuma Training**

26        Any surgeon interested in implanting Penuma must first complete training,

27  which includes a mandatory visit with Dr. Elist to observe the Penuma implant

28  procedure.  (Dr. Elist Dec., ¶ 11.)  Only authorized surgeons are permitted to

1  purchase Penuma and perform the implant procedure.  (*Id.*)

2       On January 11, 2018, Cornell contacted Gesiva to express his interest in

3  receiving Penuma training.  (October 6, 2020 Declaration of Brian T. Grace ("Grace

4  Dec."), Ex. C.)  Cornell, a Houston, Texas, urologist, heard of Penuma shortly

5  before seeking training.  (*Id.*, Ex. A at 136:7-18.)  Cornell stated he had "several

6  patients express a desire to both learn about your product [Penuma] with a real

7  interest in moving forward."  (*Id.*, Ex. C.)  Cornell saw a real opportunity to expand

8  the level of service" he currently offers his patients and wanted to learn more about

9  Penuma "expeditiously."  (*Id.* Exs. A at 136:19-24, C.)  Gesiva arranged for Cornell

10  to travel to observe Dr. Elist implanting Penuma.  (Louie Dec., ¶ 4.)

11       At that time, Cornell had no experience with cosmetic penile implants.  (*Id.*,

12  Ex. A at 130:21-131:1.)  He had never seen a Penuma procedure or inspected a

13  Penuma implant.  (*Id.* at 123:8-21, 138:2-15.)  Cornell's surgical experience was

14  primarily with inflatable prosthetic penile implants designed to address erectile

15  disfunction.  (*Id.* at 27:14-28:1.)  Inflatable prosthetic penile implants are non-

16  cosmetic and share little in common with Penuma in terms of design, materials, and

17  purpose.  (Dr. Elist Dec. ¶ 24.)  Defendants admit they have not performed any

18  cosmetic penile implant procedures.  (Grace Dec., Ex. D at No. 8.)

19  **F.    Dr. Cornell Visits, Signs the Penuma NDA, Learns Trade Secrets**

20       On March 30, 2018, Cornell, accompanied by Mr. Duncan Louie, began his

21  Penuma training with Dr. Elist in Beverly Hills, California.  (Louie Dec. ¶ 5.)  Upon

22  arrival, Dr. Cornell was required to sign a Confidentiality Agreement (the "Penuma

23  NDA").  (Dr. Elist Dec., Ex. M.)

24       The Penuma NDA required Cornell to "protect and hold in the strictest

25  confidence the Confidential Information; [] not disclose any Confidential

26  Information to any person or entity, unless required by law or other regulatory

27  authority . . . and [] not use directly or indirectly the Confidential Information for its

28  own benefit or benefit of any other person."  (*Id.*)  "Confidential Information"

includes information relating to "past, present, or future products, services, []
techniques or technical information and data" regarding Penuma.  (*Id.*)

On March 30, 2018, Cornell observed Dr. Elist perform four Penuma implant
procedures.   (Dr. Elist Dec., ¶ 25, Louie Dec. ¶ 7, Grace Dec., Ex. A at 153:12-
154:4.)  Before, after, and especially during the procedures, Cornell asked Dr. Elist
numerous questions about Penuma and the implant procedure.  (Dr. Elist Dec., ¶ 25,
Louie Dec., ¶¶ 6-7, Declaration of Minerva Acosta ("Acosta Dec."), ¶¶ 4-6.)
Cornell asked why certain steps were taken during the procedure and why Penuma
was designed the way it was.  (*Id.*)  Cornell asked specific questions about the mesh
and the sutures Dr. Elist used.  (*Id.*)  Cornell also asked about issues patients had
experienced and what Dr. Elist's plans were for future versions of Penuma.  (*Id.*)  It
is customary for Dr. Elist to answer questions from numerous surgeon trainees as
part of the training.  (*Id.*)  Dr. Elist understood Cornell would be subject to the
Penuma NDA.  (Dr. Elist Dec., ¶ 25.)  Dr. Elist explained that he had plans to
integrate mesh tabs onto the implant, particularly in and around the distal tip.  (Dr.
Elist Dec., ¶ 25.)  Dr. Elist told Cornell this would help with implant placement and
allow for absorbable sutures.  (*Id.*)  Dr. Elist also told Cornell he planned to create a
softer version of Penuma using internal pockets or voids of space in the silicone.
(*Id.*)  Dr. Elist also told Cornell about plans for coating Penuma with an antibiotic or
antimicrobial layer.  (*Id.*)

During breaks between procedures, Cornell met with Jonathan Elist, Louie,
and at times Dr. Elist. (Dr. Elist Dec., ¶ 25, Louie Dec., ¶ 9, J. Elist Dec., ¶ 7.)
Cornell also asked Mr. Louie for the list of surgical instruments and materials used
by Dr. Elist for the Penuma procedure.  (Louie Dec., ¶ 10; Grace Dec., Ex A at
163:16-165:6.)  On April 2, 2018, pursuant to the NDA, Louie sent Dr. Elist's
confidential list of surgical instruments to Cornell.  (Grace Dec. Ex. F.)

**G.     Days after Dr. Cornell's Penuma Training, He Begins Developing a
         Competing Cosmetic Penile with Penuma Trade Secrets**

1    Although he had never developed a medical device nor applied for a patent,

2    Cornell returned to Texas from his Penuma training to work on a cosmetic penile

3    implant to compete with Penuma – Augmenta.[3]  (Grace Dec., Ex. A at 174:23-

4    175:5, 246:5-23.)

5    Cornell almost immediately contacted Joel Chechik to ask for a

6    recommendation for an engineer to help build a cosmetic penile implant (using

7    Plaintiffs' trade secret information).  (*Id.* at 50:13-51:3.)  Chechik recommended an

8    engineer named Hans Mische who had experience building inflatable penile

9    implants, but no experience with silicone penile implants.  (*Id.* at 37:1-20.)

10    On April 9, 2018, Mische sent Dr. Cornell three patents to review, two of

11    which were Dr. Elist's related to Penuma.  (*Id.*, Ex. A at 171:19-172:8.)  In

12    response, Cornell wrote, "███████████████████████████████████████

13    ████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████

15    ███████████  (*Id.*, Ex. G.)   On the same day, Dr. Cornell sent Mische a copy of

16    Dr. Elist's list of surgical supplies and instruments.  (*Id.*, Ex. H.)

17    Cornell was aware the Penuma NDA presented a problem related to his

18    disclosure of confidential information he received from Dr. Elist.  On April 23,

19    2018, Cornell sent the Penuma to NDA to Mische and asked, "████████████

20    ████████████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████████

22    ████████████████████████"  (Grace Dec., Ex. I.)  In response, Mische stated he

23    ████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████████

25    ███████████████████████████"  (*Id.*)  On the *very same day*, Cornell

26    emailed Louie to ask about a second Penuma training trip.  (*Id.*, Ex. K.)

[3] Defendants' documents suggest Cornell was planning to compete *before* his training visit. (Grace Dec., Ex. B at 12405.)

1   In the weeks that followed, Cornell and Mische founded Augmenta, LLC and
2   continued to think about Penuma.  (Grace Dec., Exs. L, M.)  Cornell reported to
3   Mische that potential investors "██████████████████████████████████████
4   ████████████████████████████████████████████████████████████
5   ████████████████████████████████████████████████
6   ██████████████" (*Id*., Ex N.)
7   On July 23, 2020, Cornell filed a provisional patent application for the
8   Augmenta implant.  (Grace Dec., Ex. O.)  The provisional application included
9   several of Dr. Elist's confidential design concepts Cornell learned from Dr. Elist
10  during Cornell's training visit – namely, mesh tabs imbedded in the distal portion of
11  the implant in coordination with absorbable sutures.  (*Id.*)  In subsequent patent
12  filings, Cornell included Dr. Elist's design idea for internal pockets of space in the
13  implant, which ultimately led to patent issuance.
14  **H.   Cornell Misrepresents Himself as a Penuma Implant Specialist While**
15  **Secretly Developing Augmenta With Plaintiffs' Trade Secrets**
16  In early April 2018, at the same time he was working to develop his own
17  implant, and before completing Penuma training, Cornell began promoting himself
18  on his website as a "Penuma Penile Enhancement Specialist." (Grace Dec., Exs. W,
19  X; J. Elist Dec., Ex. B.)   Cornell falsely claimed he "provides Penuma penile
20  enhancement surgery." (*Id.*)  He also specifically instructed his marketing agency to
21  begin placing ads on Google for searches related to Penuma to increase traffic to his
22  website, which stated he was authorized to implant Penuma.  (Grace Dec., Ex. Z.)
23  The Google ads inferred Cornell was a Penuma surgeon and targeted users who
24  searched for penile implants or Penuma.  Cornell did this without authorization.
25  On April 23, 2018, Cornell sent an email to Louie regarding scheduling a
26  second training visit to Dr. Elist.  (Grace Dec., Ex. K.)  Cornell testified that soon
27  after that, Louie told Cornell he would have to pay a $2,000 monthly Penuma
28  marketing fee.  (*Id.*, Ex. A at 166:12-167:18.)  In fact, Louie told Cornell there

might be a marketing fee, but emphasized that nothing was concrete.  (Louie Dec., ¶ __.)  Ultimately none materialized.  (*Id.*)  Cornell claimed this was when he decided to not complete his Penuma training; however, Cornell did not notify Louie nor any of the Plaintiffs until several months later.  (Grace Dec., Ex. A at 165:19-168:4; Louie Dec., ¶¶ 11, 13, Dr. Elist Dec., ¶ 26.)  Cornell also did not remove the references to Penuma on his website or in his Google advertising.  (J. Elist Dec., ¶¶ 10, 15, Exs. D, I.)  Around this time, Gesiva representatives also directed Cornell to remove Penuma references from his website because he was not authorized to display them.  (Louie Dec., ¶ 12.) Cornell said he would have his web designer remove them; this did not happen for nearly two years.  (Louie Dec., ¶ 12, J. Elist Dec., ¶¶ 10, 14-15.)

On June 25, 2018, IMD learned of Dr. Cornell's unauthorized use of Penuma on his website.  (J. Elist, ¶ 8.)  IMD wrote Cornell demanding that he "immediately take down any Penuma-related content" and "cease and desist from posting any future Penuma-related content on your website or elsewhere" until specifically authorized by IMD.  (*Id.*, ¶ 9, Ex. C.)  Cornell did not respond to the email, although he received it.  (Grace Dec., Ex. A at  217:10-218.)  At that time, Cornell removed the "Penuma Penile Enhancement Specialist" from his website, but he did not remove all Penuma content.  (*See* J. Elist Dec., ¶ 11.)  Cornell also did not stop Penuma advertising on Google.  (J. Elist Dec., ¶ 15; Grace Dec., Exs. Y-Z.)

On August 4, 2019, IMD sent a second cease and desist email to Cornell to address Cornell's continued unauthorized, false representation that he offered Penuma at his clinic in Houston. (J. Elist Dec. Ex. D.)  In response, Cornell represented that all mentions of Penuma would be removed.  (*Id.*)  However, Cornell continued to refer to Penuma on his website. (*Id.*, Ex. E.)   As of the filing of the Complaint, Cornell misrepresented he often performed genital contouring "in conjunction with Penuma penile enhancement surgery."  (*Id.*)   Cornell did not stop advertising himself as a Penuma physician on Google ads targeted to users searching

for Penuma until weeks after this case was filed. (J. Elist, Ex. I; Grace Dec., Ex. Y-BB.)  Likewise, defendant Dr. Jonathan Clavell, a urologist who works as Cornell's medical practice associate and shares an office with Cornell, misleadingly implied on his website that he performed Penuma procedures.  (J. Elist, ¶ 12, Ex. J.)

While Cornell was improperly advertising himself as a Penuma surgeon, unbeknownst to Plaintiffs, he was working with an authorized Penuma surgeon, who was a member of Penuma's advisory board, Dr. Run Wang.  (Grace Dec. Exs. A at 60:5-61:2, 126:7-19, 264:4-13; V.)  Cornell admits that Wang provided substantive design feedback and assisted with Augmenta's development.  (*Id.*, Ex.  A at 60:5-61:2, 126:7-19, 264:4-13.)  Wang had also signed a confidentiality agreement with IMD.  (Dr. Elist Dec. ¶ 23.)

**I.    Dr. Cornell Solicits Augmenta, LLC investment and Disparages Penuma**

After the provisional patent application, in mid-2018, Cornell replaced Mische as the Augmenta implant design engineer with Huck Medical Technologies, Inc. ("HMT"), a "start-up" with apparently no experience designing cosmetic implants or silicone devices.  (Grace Dec., Ex. A at 87:15-88:2, P at 2565-66.)  A November 2018 HMT presentation highlighted the purported "advantages" of Augmenta over Penuma, all of which were the design elements Dr. Elist disclosed to Dr. Cornell pursuant to the Penuma NDA.  (*Id.*, Ex. P.)  The presentation also included an unauthorized copy of a still image from IMD's informational videos about Penuma.  (*Id.* at 2556.)

In December 2018, Cornell distributed a Confidential Offering Memorandum ("PPM") seeking ███████ for Augmenta, LLC.  (Grace Dec., Ex. B.)  In the PPM, Cornell claimed he learned of patients experiencing problems with existing cosmetic penile implants which led him to visit Dr. Elist.  (*Id.*)  Cornell listed as a risk Dr. Elist filing a lawsuit for intellectual property infringement.  (*Id.*)  Based on his representations, Cornell raised the full ███████.  (*Id.*, Ex. A at 65:10-17.)  Drs. Clavell and Wang gained an interest in Augmenta, LLC.  (*Id.*, Ex. A. at 58:24-61:2.)

**J.      Based on Plaintiffs' Trade Secrets Augmenta, LLC Receives A Patent**

On January 3, 2019, Augmenta, LLC filed two patent applications for the Augmenta implant.  Patent Application No. 16/238,792 for "Penile Implants that Facilitate Tissue Expansion" later matured into U.S. Patent No. 10,413,413 ("'413 Patent").  (Grace Dec., Ex. C.)  Patent Application No. 16/238,821 ("'821 Application") remains pending.  (*Id.*, Ex. EE.)  The USPTO initially rejected all its claims citing Dr. Elist's patents.  (*Id.* at 1183-93.)  However, Defendants continue to pursue it, and Cornell expects it to be issued soon.  (*Id.,* Ex. A at 254:14-255:11.)  Both the '413 Patent and the '821 Application list as co-inventors Cornell, Hans Mische and David Nichols of HMT.  (*Id.*, Exs. CC, EE.)  Both incorporate three of Dr. Elist's design concepts he disclosed to Dr. Cornell pursuant to the Penuma NDA, including the internal pockets of space in the silicone body, mesh tabs imbedded in the implant, and absorbable sutures.  (*Id.*)  Both also include, without authorization, the same still image from Dr. Elist's informational video, used in the November 2018 HMT investor presentation. (*Id.*)

During the prosecution of the application for the '413 Patent, the USPTO initially rejected all claims because of Dr. Elist's Penuma patents.  (Grace Dec., Ex. Q.)  Importantly, the USPTO rejected claim 1, the only independent claim, and several dependent claims as being anticipated by Dr. Elist's U.S. Patent No. 6,537,204 (the "'204 Patent").  (*Id.*)  The USPTO rejected all the remaining dependent '413 Patent claims finding that all claims in Augmenta, LLC's patent application were not patentable over Dr. Elist's patent.  (*Id.*)

To overcome the USPTO's rejection and present inventive subject matter, claim 1 of the application was amended to include internal pockets of space in the silicone body of the implant.  (*Id.*, Ex. DD at 1056-60.)  Notes from the interview with the USPTO examiner reveal Cornell succeeded in convincing the examiner that Plaintiffs' trade secrets – which Cornell had used without authorization and in violation of the Penuma NDA – are indeed the inventive subject matter of the '413

1 Patent.  (*Id.*)  Defendants then incorporated Plaintiffs' confidential trade secrets in
2 April 30, 2019 patent claim amendments.  (*Id.*)

3      On September 17, 2019, based on the addition of the internal pockets of space
4 in claim 1, the USPTO granted the '413 Patent.  (Grace Dec., Ex. CC.)  In doing so,
5 Defendants published of Plaintiffs' confidential trade secret designs.  (*Id.*)

6 **K.   Augmenta, LLC Applies for FDA Clearance Using Plaintiffs'**
7        **Confidential Designs and Prematurely Advertises**

8      In January 2020, Augmenta, LLC applied for FDA 510(k) clearance for the
9 Augmenta implant citing Penuma as a substantially equivalent predicate medical
10 device.  (Grace Dec., Ex. R.)  Augmenta, LLC's 510(k) application stated in no
11 uncertain terms:



19 (*Id.*)  Although Augmenta's application remains pending, Defendants have
20 already taken steps to commercialize the Plaintiffs' trade secrets by marketing
21 the Augmenta implant online.   Beginning in January 2020, Defendants
22 published the website for the Augmenta implant.  (J. Elist Dec. ¶ 13, Ex. G.)
23 The website initially included photos of the Augmenta Implant and a price
24 listing of $6,500 with the message "In Stock – *Free Shipping*."  (*Id.*, Ex. H.)
25 It also promoted "Augmenta Implant Surgeon Certification" as $10,000.  (*Id.*)

26      As of the filing of this action, on April 15, 2020, the Augmenta Implant
27 website was fully functional, with pages for "Media and Marketing Support,"
28 "Sizing Kit and Replacements," "Surgeon Login," and "Contact Us." (J. Elist Dec.,

Ex. H.)  Defendants included a page titled "Why Augmenta" that included several unverifiable claims about both the Augmenta implant and by obvious implication, Penuma.  (*Id.*, Ex. J.)  Defendants claimed the "Augmenta is lighter and softer than any other cosmetic penile implant available.  Unlike rigid, unnatural silicone used in other penile implants, Augmenta's soft and flexible Honeycomb technology produces a comfortable and natural look and feel that is truly one-of-a-kind."  (*Id.*)  Defendants further claimed without evidence of FDA clearance or approval that the Augmenta is "safe and effective."  (*Id.*)  The "Why Augmenta" remained publicly available until September 24, 2020, when Dr. Cornell, during a break of his deposition, had it removed, along with images of the Augmenta implant and a link to an Augmenta NDA.  (Grace Dec., Ex. A at 113:14-115:4.)

**L.      Defendants Confuse Patients in the Cosmetic Penile Implant Market**

As of the filing of the Complaint in April 2020, Cornell and Dr. Clavell both continued to reference Penuma on their websites without Plaintiffs' authorization despite IMD's two prior cease and desist letters. It was not until after Plaintiffs filed this lawsuit that Cornell stopped advertising himself as a Penuma doctor on Google ads using targeted ads to drive traffic searching for Penuma to his website. (Grace Dec., Exs. Y-BB.)  One such ad stated, "Robert J. Cornell, MD PA – Penuma Houston." (J. Elist Dec. Ex. I.)   Defendants' internal records reflect that Cornell's Google ads targeting Penuma resulted in dozens of appointment bookings and telephone inquiries.  Moreover, as of November 2019, Cornell claimed in internal correspondence that he began compiling a patient list with phone numbers, email addresses and sizing measurements.  (Grace Dec., Ex. U.)

Unsurprisingly, Plaintiffs have received no fewer than 23 calls and messages from actual or potential patients expressing confusion about Augmenta, its connection to Penuma, and whether Dr. Cornell offered Penuma.  (Dr. Elist Dec. ¶ 27, Ex. N.)  Moreover, one patient reported to IMD that he found Cornell through his Penuma advertisements.  (J. Elist, ¶ 16.)  The patient went for a consultation

with Cornell in or around April or May 2019 at which time Cornell presented him with another implant Cornell said he developed.  (*Id*.)  According to the patient, Cornell said he was going through the FDA process for his implant, so he suggested he put the patient in a queue.  (*Id*.)  Plaintiffs expect this is not an isolated incident.

<u>**ARGUMENT**</u>

Plaintiffs satisfy all requirements for a preliminary injunction: they likely will succeed on the merits and suffer irreparable harm absent preliminary relief; the balance of equities tip in their favor; and an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the alternative, the Ninth Circuit also allows a preliminary injunction when, like here, a plaintiff can demonstrate irreparable harm, that an injunction is in the public interest, and "that serious questions going to the merits were raised and the balance of hardships tips sharply in the [movant's] favor."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

**A.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

1.  <u>Plaintiffs Will Succeed on Their Trade Secrets Claims</u>

To prevail on trade secret claims, Plaintiffs must show Defendants acquired Plaintiffs' trade secrets through means Defendants knew or should have known were improper.  Cal. Civ. Code § 3426.1 (CUTSA); 18 U.S.C. §§ 1836, 1839 (DTSA); *WeRide Corp v. Kun Huang*, 379 F. Supp.3d 843, 845 (N.D. Cal. 2019) (citing *Space Data Corp. v. X*, 2017 WL 5013363, at *1 (N.D. Cal., Feb. 16, 2017)).

2.  <u>Defendants Misappropriated Plaintiffs' Trade Secrets</u>

A "trade secret" is information that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain secrecy.  Cal. Civ. Code § 3426.1(d); 18 U.S.C.A. § 1839(6).  Trade secrets at issue in this motion are the Penuma implant surgery instrument list and the following confidential Penuma design concepts:

(1) internal pockets or voids of space to increase softness;

(2) use of mesh tabs imbedded in or around the distal tip of the implant; and

(3) use of absorbable sutures in coordination with the mesh tabs.

Plaintiffs derived significant economic value from the confidential design ideas and supply list not being generally known to the public.  Dr. Elist came up with the ideas for these unreleased design concepts over the course of his significant cosmetic implant experience, over many years, with Penuma, as well as his observations of patients.  (Dr. Elist Dec., ¶¶ 14-17.)  The ideas were unique to Penuma, the only cosmetic silicone penile implant on the market.  Indeed, courts have found that unreleased designs or concepts have value.  *See Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 962 (C.D. Cal. 2011) (a toy manufacturer's unreleased toy concepts are valuable trade secrets); *see also Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 63-64 (2014) ("[a] concept can have enough value to justify trade secret protection even if further refinement and development is required before a product . . . can be brought to market.").

Plaintiffs expended significant time, effort, and resources developing these unreleased designs – they worked with two device manufacturers.  *See United States v. Chung*, 659 F.3d 815, 826 (9th Cir. 2011) (investment of substantial time, effort, and money in developing and testing design concepts is circumstantial evidence of their independent value).  Moreover, the value of Plaintiffs' design ideas is further evidenced by Defendants' ill-gotten gains.  But for Defendants' use of Plaintiffs' confidential design ideas, Defendants would have no '413 Patent or '821 Patent Application; nor would Augmenta be submitted for FDA clearance.  *Mattel, Inc.*, 782 F. Supp. 2d at 959 (value of the design plans and concepts can be determined by considering whether the trade secret information "provides a business with a substantial business advantage" or some sort of actual or future competitive advantage).  Defendants also raised significant capital, based on projected revenue of over $100 million within five years of Augmenta's launch.  As Defendants'

1  financial models show, IMD's trade secrets have significant value.

2    Plaintiffs also satisfy the second prong – reasonable efforts to maintain

3  secrecy.  *See* 18 U.S.C. § 1839(3)(A); Cal. Civ. Code § 3426.1(d)(2) (efforts must

4  be "reasonable under the circumstances").  Under California law, absolute secrecy is

5  not required to protect a trade secret.  See *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 436

6  (9th Cir. 1975); *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 2008 WL

7  11515597, at *2 (N.D. Cal., Apr. 17, 2008); *Kittrich Corp. v. Chilewich Sultan,*

8  *LLC*, 2013 WL 12131376, at *4 (C.D. Cal., Feb. 20, 2013).  Plaintiffs employ a

9  number of security measures to maintain the secrecy of trade secret and confidential

10  information, including a locked file for segregating trade secret materials,

11  employment policies, and confidentiality agreements with all third parties and

12  training physicians. (Dr. Elist, ¶¶ 21-23.) And Cornell signed the Penuma NDA.

13    3.  Defendants Acquired Trade Secrets Through Improper Means

14    Trade secret "misappropriation" is acquisition of another's trade secret "by a

15  person who knows or has reason to know that the trade secret was acquired by

16  improper means." 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)(1).  Parties

17  using misappropriated trade secrets are also liable if they know or have reason to

18  know that the "trade secret was derived from or through a person who had utilized

19  improper means to acquire it." 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)(2).

20  In this context, "improper means" includes "theft" and "breach of a duty to maintain

21  secrecy."  18 U.S.C. § 1839(6); Cal. Civ. Code § 3426.1(a).

22    Although "[m]isappropriation and misuse can rarely be proved by convincing

23  direct evidence," the misappropriation in this case is evident.  *BladeRoom Grp. Ltd.*

24  *v. Emerson Elec. Co.*, 331 F. Supp. 3d 977 (N.D. Cal. 2018).  "In most cases

25  plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from

26  which the trier of fact may draw inferences which convince him [or her] that it is

27  more probably than not what plaintiffs alleged happened did in fact take place." *Id.*

28  No web is required to appreciate Defendants' trade secret misappropriation.

When Cornell stole Plaintiffs' trade secrets and shared them with business partners to found a new venture, used the trade secrets to obtain a medical device patent, and then raised capital for the new business venture built on the trade secrets, he knowingly misappropriated Plaintiffs' trade secrets by improper means.

Before visiting Dr. Elist, Cornell had several patients express interest in Penuma.  (Grace Dec., Ex. A at 136:19-138:14.)  Cornell had never held a Penuma implant, seen a Penuma implant procedure, or spoken to or inspected anyone who had received a Penuma implant.  (*Id.*)

Cornell visited Dr. Elist to receive Penuma training.  He signed the Penuma NDA which imposed a duty to maintain the confidentiality of all information he received "past, present, or future products, services, [] techniques or technical information and data" regarding Penuma.  (Dr. Elist Dec., Ex. M.)  Cornell asked Dr. Elist numerous questions about the procedure, Penuma, and Dr. Elist's intended plans for changes to the design with the hidden motive to use the information he gained to develop his own implant.  Dr. Elist answered Cornell's questions before, after and especially during the procedures, and his answers revealed Plaintiffs' confidential designs intended for future versions of Penuma, including internal pockets of space and incorporation of mesh tabs with absorbable sutures.

Cornell's interest went beyond that of the typical surgeon trainee.  (Louie Dec. ¶ 8; Acosta Dec. ¶ 5.)  He took copious notes of Dr. Elist's explanations and answers during the procedures, which was unusual.  (*Id.*)  Following the visit, Cornell immediately began using Plaintiffs' trade secrets, presumably based on his notes, to design his own cosmetic penile implant to compete with Penuma.  The first email he sent to the engineer he teamed with was to share, without authorization, Dr. Elist's confidential list of Penuma surgical supplies and materials.  (Grace Dec. Ex. H.)  They proceeded to analyze and use Plaintiffs' confidential trade secret design. Eventually, Defendants filed for a provisional patent.

Cornell formed Augmenta, LLC and applied for two patents using Plaintiffs'

1    stolen trade secret designs, including mesh tabs, absorbable sutures, and internal

2    pockets of space.  Cornell had never created a medical device or applied for a

3    patent.  To overcome USPTO's initial rejection, Cornell amended Claim 1 to

4    highlight internal pockets, which produced issuance of the '413 Patent.  The

5    inventive features of the '413 Patent are based *entirely* on Plaintiffs' trade secrets.

6    Defendants have since submitted Augmenta for FDA clearance, citing Penuma as a

7    substantially similar predicate device.  And Plaintiffs only recently learned that one

8    of Penuma's advisory board, Dr. Run Wang, who is subject to a confidentiality

9    agreement with Penuma, had been named CEO of Augmenta, LLC and had acquired

10   an equity interest in that entity – these things occurring while Wang purported to

11   serve on Penuma's advisory board.

12        Defendants' misappropriated through the "improper means" of Cornell's

13   breach of the Penuma NDA.  Plaintiffs trade secret claims are likely to succeed.

14   **B.**    **Plaintiffs Will Succeed on Their Trademark Infringement Claims**

15        Under the Lanham Act, trademark infringement liability arises when a party

16   "use[s] in commerce any reproduction, counterfeit copy, or colorable imitation of a

17   registered mark in connection with the sale ... of any goods ... [where] such use is

18   likely to cause confusion ... or deceive." 15 U.S.C. § 1114(1)(a).  Plaintiffs must

19   demonstrate that (1) their mark is protected; (2) Defendants used Plaintiffs' mark in

20   commerce; and (3) in a manner likely to cause confusion.  *Ossur hf v. Manamed

21   Inc.*, 331 F. Supp. 3d 1005, 1011 (C.D. Cal. 2017) (citing *Applied Ino. Scis. Corp v.

22   eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

23        Trademark infringement constitutes counterfeiting when the infringer uses a

24   "counterfeit mark" which is "(1) a non-genuine mark identical to the registered,

25   genuine mark of another, where (2) the genuine mark was registered for use on the

26   same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A.

27   v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (citing *Idaho Potato

28   Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005)).

Plaintiffs can demonstrate both infringement and counterfeiting because Defendants used the exact Penuma mark on their websites and in Google ads without authorization to promote their cosmetic urology practices and divert customers from Penuma to Defendants' Augmenta implant.

### 1.   Plaintiffs Own the Penuma Mark

Registration of a mark constitutes prima facie evidence of the registered mark's validity and of Plaintiffs' exclusive rights to use it.  *See* 15 U.S.C. § 1115(a). "When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).  Penuma is registered.  (Dr. Elist Dec. Ex. A.) Defendants cannot rebut Plaintiffs' ownership.  Penuma is a fanciful term Plaintiffs' invented with no relation to the product; as such, the Penuma mark receives automatic trademark protection.  *Platinum Home Mortg. Corp. v. Platinum Fin. Gr.p, Inc.* 149 F.3d 722, 727 (7th Cir.1998) ("suggestive, arbitrary, or fanciful [terms inherently distinctive] and automatically entitled to trademark protection.").

### 2.   Defendants Used the Penuma Mark Without Authorization

Defendants reproduced the registered Penuma mark on their websites. Cornell used the same Penuma mark in advertisements and purchased Penuma as a keyword on Google Ads to ensure users searching for Penuma would view his advertisement.  Likewise, Clavell, an associate of Cornell's in the same office space, included misleading references to Penuma on his website that falsely implied he was a Penuma trained surgeon.  Defendants' Penuma ad campaigns drove traffic to their websites, which falsely stated Defendants offered Penuma.

Despite two cease and desist letters demanding removal of the Penuma mark, Defendants continued to use it on their websites; Cornell continued to use it in his Google advertisements; and Cornell continued to use Penuma as a keyword to target users who searched for Penuma.  Theses willful acts of infringement were designed to divert traffic from Plaintiffs to Defendants. The evidence shows that this

1  occurred.  This type of internet activity constitutes "use in commerce" for the

2  purposes of trademark infringement.  *Fin. Exp. LLC v. Nowcom Corp.*, 564 F. Supp.

3  2d 1160, 1172-73 (C.D. Cal. 2008).

4              3.    <u>Defendants Caused Confusion Using the Penuma Mark</u>

5          To establish likelihood of consumer confusion, the test is "whether a

6  'reasonably prudent consumer' in the marketplace is likely to be confused as to the

7  origin of the good or service bearing on the marks."  *Dreamwerks Prod. Grp., Inc. v.*

8  *SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).  "Likelihood of confusion is a

9  factual determination normally made using an eight factor test." *Phillip Morris USA,*

10  *Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) (citing *Accuride Int'l*

11  *Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989)).  However, where one

12  uses a counterfeit mark "in an apparent attempt to capitalize upon the popularity of,

13  and demand for, another's product, there is a presumption of a likelihood of

14  confusion." *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir.

15  1987); *see also Transgo, Inc. v. AJAC Transmission Parts Inc.*, 768 F.2d 1001, 1016

16  (9th Cir. 1985).  Here, Defendants used the exact Penuma mark on their websites

17  and in Google ads without authorization to promote their cosmetic urology practices

18  and divert customers from Penuma to Augmenta, a competing implant.

19          Defendants' use of the Penuma mark generated initial interest confusion,

20  which "results when a consumer seeks a particular trademark holder's product and

21  instead is lured to the product of a competitor by the competitor's use of the same or

22  a similar mark."  *Williams-Sonoma, Inc. v. Amazon.com, Inc.*, 2019 WL 7810815, at

23  *7 (N.D. Cal., May 2, 2019) (quoting *Australian Gold, Inc. v. Hatfield*, 436 F.3d

24  1228, 1238 (10th Cir. 2006)).  "Even though the consumer eventually may realize

25  that the product is not the one originally sought, he or she may stay with the

26  competitor.  In that way, the competitor has captured the trademark holder's

27  potential visitors or customers." *Id.*; *see also Nissan Motor Co. v. Nissan Comput.*

28  *Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004).

1   Defendants' use of the Penuma mark on their websites caused considerable

2   confusion.  Plaintiffs have received no fewer than 23 calls and messages from

3   patients confused by Defendants actions.  (Dr. Elist Dec. ¶ 27, Ex. N.)  A reasonable

4   consumer would be confused by Defendants' claims they offered Penuma.

5   Defendants clearly hoped to lure potential patients away from Plaintiffs by holding

6   themselves out to be Penuma surgeons while intending to offer their competing

7   Augmenta implant.  In fact, at least one patient who inquired about Penuma in

8   response to Defendants unauthorized advertisements was discouraged from using

9   Penuma in favor of Augmenta.  Defendants infringed the Penuma mark.

10  **C.    PLAINTIFFS HAVE SUFFERED IRREPARABLE HARM**

11  Plaintiffs continue to suffer irreparable harm as a result of Defendants'

12  wrongful conduct.  Defendants' "intention to make imminent or continued use of a

13  trade secret . . .  will almost always certainly show irreparable harm."  *Pac.*

14  *Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003)

15  (quoting *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 92–93 (3rd Cir.1992).)

16  Without an injunction, Defendants will commercialize Plaintiffs' trade secrets to

17  directly compete with, and take market share from, Penuma.  Defendants predict

18  their theft of Plaintiffs' trade secrets will generate annual revenues over $100

19  million in five years.  (Grace Dec., Ex. B at 12439.)  This loss of market share is

20  also irreparable harm.  "[T]he loss of clients and market share is not economic loss

21  that can be fully compensated by a damage award" and can constitute "irreparable

22  harm." *WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1165 (D. Haw.

23  2018) (quoting *UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1125 (D. Haw. 1998)).

24  Defendants' actions have confused customers in the market, irreparably

25  harming Penuma's goodwill.  Defendants falsely promoted themselves on websites

26  as Penuma specialists.  Dr. Cornell advertised himself as a Penuma physician via

27  targeted Google ads.  Despite two cease and desist letters, Defendants did not stop

28  their infringement until after this case was filed.  Patients are already confused.

1    Without the FDA clearance or approval required to make such claims,

2   Defendants have publicly represented Augmenta as the safest cosmetic penile

3   implant available (and claim superiority over other cosmetic penile implants, which

4   are too "rigid" and "unnatural").  Cornell has also advised at least one patient, who

5   inquired about Penuma in response to Cornell's ads, to wait for Augmenta instead of

6   Penuma.  All of these efforts irreparably harm Plaintiffs' and Penuma's goodwill.

7   *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir.

8   2013) ("[e]vidence of loss of control over business reputation and damage to

9   goodwill [can] constitute irreparable harm."); *Rent–A–Center, Inc. v. Canyon

10  Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991) ("intangible

11  injuries, such as damage to . . . goodwill, qualify as irreparable harm").

12    Defendants' actions also threaten immeasurable harm to the reputation of

13  safety and effectiveness of cosmetic penile implants.  Through Penuma, Plaintiffs

14  have slowly rebuilt public confidence in cosmetic penile enhancement.  Whereas

15  Penuma has a proven record of safety and effectiveness, cosmetic penile

16  enhancement procedures before it, including fat injections and dermal graft or

17  fillers, were ineffective and unsafe; medical experts warn against those procedures.

18  (Dr. Elist Dec., ¶ 10, Ex. B.)  Even worse, Augmenta uses Dr. Elist's design ideas in

19  ways that may pose serious health risk to patients.  (*Id.* ¶ 28.)  The introduction of

20  such risk would further irreparably harm Plaintiffs.

21    Plaintiffs cannot be compensated by money damages for the irreparable harm

22  that has already occurred or for the harm Defendants continue to inflict.

23  **D.    OTHER FACTORS FAVOR INJUNCTIVE RELIEF WITH NO BOND**

24    The balance of equities favors a preliminary injunction because Plaintiffs'

25  proposed injunction "would do no more than require [Defendants] to comply with

26  federal and state laws." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077

27  (N.D. Cal. 2016) (injunction that requires a party to comply with law is not a

28  burden).  Defendants have yet manufactured Augmenta, which is not approved or

cleared by the FDA.  An order prohibiting Defendants from further commercializing Plaintiffs' trade secrets would maintain the status quo pending final determination of this action.  In cases where a plaintiff has shown a defendant is likely misappropriating a trade secret, courts have routinely held the that the degree of hardships favors the plaintiff.  *See, e.g., WeRide Corp.*, 379 F. Supp. 3d at 854; *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 2020 WL 1433525, at \*6 (D. Nev., Mar. 23, 2020).  The balance of equities favors injunctive relief.

The public interest is best served by "vindicating intellectual property rights, and in prohibiting unfair competition." *Waymo v. Uber Technolgies, Inc.*, 2017 WL 2123560, at \*12 (N.D. Cal., Mar. 2, 2018).  Public interest supports the protection of Plaintiffs' trade secrets and other intellectual property.  Injunctive relief will best provide that protection.

Last, no bond is required for relief that "simply enjoin[s] Defendant[s] from doing something Defendant[s] never had a right to do in the first place." *Comet Technologies v. Beuerman*, 2018 WL 1990226, at \*6 (N.D. Cal., Mar. 15, 2018).

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request the Court grant the motion for preliminary injunction.

Dated: October 6, 2020          BAKER MARQUART LLP

                        By:   */s/ Ryan G. Baker*
                             Ryan G. Baker
                             *Attorneys for Plaintiffs,*
                             *INTERNATIONAL MEDICAL DEVICES, INC., MENOVA INTERNATIONAL, INC., and JAMES ELIST, M.D.*