Ryan G. Baker (Bar No. 214036)
  rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@waymakerlaw.com
Brian T. Grace (Bar No. 307826)
  bgrace@waymakerlaw.com
Emily R. Stierwalt (Bar No. 323927)
  estierwalt@waymakerlaw.com
WAYMAKER LLP
777 S. Figueroa St., Suite 2850
Los Angeles, California 90017
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Plaintiffs*
*International Medical Devices, Inc.,*
*Menova International, Inc., and*
*James Elist, M.D.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| INTERNATIONAL  MEDICAL DEVICES, INC., et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>ROBERT CORNELL, MD, et al.,<br><br>             Defendants. | Case No. 2:20-cv-03503-CBM (RAOx)<br><br>**PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**<br><br>Judge: Hon. Consuelo B. Marshall<br><br>Date: October 12, 2021<br>Time: 10:00 a.m.<br>Courtroom: 8B<br><br>[Filed concurrently with Plaintiffs' Motion for Summary Adjudication] |

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

Plaintiffs International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova"), and James Elist, M.D. submit the following Separate Statement of Undisputed Facts in Support of their Motion for Summary Adjudication.

## UNDISPUTED FACTS

| Plaintiffs' Undisputed Facts and Supporting Evidence | Defendants' Response and Evidence |
|---|---|
| **BACKGROUND SECTION** | |
| 1.　Dr. Elist is licensed as a physician and surgeon type "A" by the Medical Board of California. <br><br> (Declaration of James Elist, MD in support of Plaintiffs' Motion for Summary Adjudication) ("Dr. Elist Decl.") ¶ 2.) | |
| 2.　Dr. Elist has practiced urology since 1976 and currently focuses on the fields of aesthetic and reconstructive urology, male sexual dysfunction, and male infertility. <br><br> Dr. Elist Decl. ¶ 3. | |
| 3.　Dr. Elist has owned a private medical practice based in Beverly Hills, California, which has offered urology services since 1982. <br><br> Dr. Elist Decl. ¶ 3. | |
| 4.　Dr. Elist is the sole inventor of no fewer than nine patents on penile implants dating back to August 29, 1995.  These | |

| | |
|---|---|
| include U.S. Patent Nos. 5,445,594 (the "'594 Patent") (implant for expanding penile girth and length); 5,669,870 (the "'870 Patent") (penile implant for improved appearance); 5,899,849 (the "'849 Patent") (subcutaneous penile implant); D462,770 (the "'770 Design Patent") (tapered penile implant); 6,475,137 (the "'137 Patent") (subcutaneous penile implant); 6,537,204 (the "'204 Patent") (structural penile implant); 8,986,193 (the "'193 Patent") (penile implant); 9,504,573 (the "'573 Patent") (prosthesis for improved penis function); and 10,350,070 (the "'070 Patent") (prosthesis for improved penis function). Some of these patents protect a cosmetic silicone penile implant designed to expand the size of a penis by facilitating tissue expansion (referred to as "Penuma"). Dr. Elist Decl. ¶ 5. Jonathan Elist Declaration in Support of Plaintiffs' Motion for Summary Judgment Motion ("J. Elist Decl.") ¶ 2. | |
| 5.    Dr. Elist performs Penuma implant surgeries in the Beverly Hills South Pacific Surgery Center. Dr. Elist Decl. ¶ 4. J. Elist Decl. ¶ 3. | |
| 6.    Dr. Elist invented a cosmetic subcutaneous silicone penile implant referred to as Penuma. Dr. Elist Decl. ¶¶ 4-5. | |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| J. Elist Decl. ¶ 2. | |
| 7. Penuma was first cleared by the United States Food and Drug Administration ("FDA") in 2004.<br><br>Dr. Elist Decl. ¶ 10. | |
| 8. Dr. Elist has been implanting Penuma implants since receipt of FDA clearance in 2004.<br><br>Dr. Elist Decl. ¶ 12. | |
| 9. Dr. Elist created Menova International, Inc. ("Menova") to hold various intellectual property associated with the Penuma implant.<br><br>Dr. Elist Decl. ¶ 6. | |
| 10. Dr. Elist formed International Medical Devices, Inc. ("IMD") in 2013 to be the distributer of the Penuma implant.<br><br>Dr. Elist Decl. ¶ 11. | |
| 11. Dr Elist is the President of IMD.<br><br>Dr. Elist Decl. ¶ 11.<br><br>J. Elist Decl. ¶ 2. | |
| 12. Jonathan Elist is the Chief Executive Officer of IMD.<br><br>J. Elist Decl. ¶ 2.<br><br>Dr. Elist Decl. ¶ 11. | |

- 3 -

| | |
|---|---|
| 13.    Until April 2019, Dr. Elist was the only physician implanting the Penuma as part of his private medical practice.<br><br>Dr. Elist Decl. ¶ 12. | |
| 14.    Beginning in fall 2017, IMD recruited several urologists to serve as members of a Penuma advisory board. IMD and the Penuma advisory board devised a training program for surgeons to become certified Penuma implanters.<br><br>Dr. Elist Decl. ¶ 25.<br><br>J. Elist Decl. ¶ 5. | |
| 15.    The first step in Penuma training to become an authorized Penuma surgeon is to visit Dr. Elist's surgical center in Beverly Hills to observe Dr. Elist perform Penuma implant procedures.<br><br>Dr. Elist Decl. ¶ 26.<br><br>J. Elist Decl. ¶ 6. | |
| 16.    IMD's practice is to require all surgeons participating in Penuma training to sign a non-disclosure agreement upon arrival to the Beverly Hill's surgery center.<br><br>J. Elist Decl. ¶ 7.<br><br>Dr. Elist Decl. ¶ 25. | |
| 17.    Only surgeons who completed Penuma training were authorized to implant Penuma and to use the Penuma | |

| | |
|---|---|
| trademark to market Penuma.<br><br>Dr. Elist Decl. ¶ 29. | |
| 18.    Penuma is currently the only cosmetic penile implant cleared by the FDA.<br><br>Dr. Elist Decl. ¶ 4.<br><br>J. Elist Decl. ¶ 2.<br><br>Emily R. Stierwalt Declaration in Support of Plaintiffs' Motion for Summary Adjudication ("ERS Decl."), Ex. B at 81:11-16 ("Penuma… remains the only implant that the FDA has approved for cosmetic purposes."). | |
| **Trademark Infringement and Counterfeit Mark** | |
| 19.    Since January 2016, Dr. Elist and IMD have continuously used the name "Penuma" in commerce to refer to the subcutaneous silicone penile implant invented by Dr. Elist.<br><br>Dr. Elist Decl. ¶ 6.<br><br>J. Elist Decl. ¶ 4. | |
| 20.    Plaintiffs published the Penuma website at www.penuma.com in 2016. Dr. Elist's medical practice website www.drelist.com was already in use years before publication of the Penuma website.<br><br>Dr. Elist Decl. ¶ 14. | |

| | |
|---|---|
| 21.     "Penuma" is a made-up word and does not have any meaning in any foreign language. Dr. Elist and Jonathan Elist coined the word "Penuma". <br><br>Dr. Elist Decl. ¶ 6. | |
| 22.     On January 10, 2016, Menova applied for trademark registration for the word mark "Penuma." <br><br>Dr. Elist Decl. ¶ 6. | |
| 23.     On September 20, 2016, the United States Patent and Trademark Office issued a trademark for the word mark "Penuma", U.S. Reg. No. 50443348 (the "Penuma Mark"). <br><br>Dr. Elist Decl. ¶ 9, Ex. D. | |
| 24.     Since Plaintiffs started using the term "Penuma", there have been numerous articles published on Penuma, including a profile by GQ and Cosmopolitan. <br><br>Dr. Elist Decl. ¶ 7 Exs. A-C. | |
| 25.     Menova owns the Penuma trademark. <br><br>Dr. Elist Decl. ¶ 9. | |
| 26.     Dr. Elist is the President of Menova, a corporation Dr. Elist created to hold the intellectual property associated with Penuma. <br><br>Dr. Elist Decl. ¶ 6. | |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO
MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| 27.    IMD and Dr. Elist advertise Penuma on the website for Penuma (www.penuma.com), the website for Dr. Elist's medical practice (www.drelist.com), in brochures, at physician conferences, and using other promotional materials, including informational videos designed to explain the product and procedure to potential patients.<br><br>Dr. Elist Decl. ¶ 14. | |
| 28.    To advertise and promote Penuma, IMD spent $11,294.88 in 2017, $11,757.64 in 2018, $11,971.85 in 2019, and $22,382.05 in 2020. Dr. Elist's medical practice spent a total of $108,152.63 on advertising, $49,043.51 on "Marketing and Promotion," and $257,639.22 on "Website Management Fees", from 2017 through 2020, much of which was spent promoting Penuma from 2017 through 2020, much of which was spent promoting Penuma.<br><br>Dr. Elist Decl. ¶ 14. | |
| 29.    Cornell is a urologist based in Houston, Texas.<br><br>ERS Decl., Ex. A at 18:20-25.<br><br>J. Elist Decl. ¶ 11, Exs. G | |
| 30.    Cornell is the owner of Robert J. Cornell, M.D., P.A., the professional association for his medical practice.<br><br>ERS Decl. Exs. A at 26:18-27:4, and Ex. II.<br><br>Defendants' Answer to First Amended | |

- 7 -

| | |
|---|---|
| Complaint Dkt. 129 ¶ 52. | |
| 31.    On March 30, 2018, Cornell attended the first day of Penuma training in California with Dr. Elist.  Cornell understood that he needed to complete additional Penuma training before he could offer the Penuma implant.

ERS Decl., Ex. A at 135:4-10; Ex. C at 121:6-8.

J. Elist. Decl. ¶ 6, Ex. A.

Dr. Elist. Decl. ¶ 27. | |
| 32.    Cornell never completed Penuma training and never received authorization to implant Penuma or advertise using the Penuma Mark.

ERS Decl., Ex. A at 164:21-165:3 ("it was my understanding that [] a second trip [to train with Dr. Elist] was required before [] I could possibly be credentialed. We never decided on a time, a day") & 166:12-23.

Dr. Elist Decl. ¶ 29. | |
| 33.    Cornell began developing a cosmetic penile implant soon after he traveled to California for his Penuma training.

ERS Decl., Ex. A at174:23-175:5. | |
| 34.    Cornell made it a "priority" of his practice to develop a product aimed at men seeking cosmetic penile implant surgery.

ERS Decl., Ex. A at 39:6-40-24 | |

- 8 -

| | |
|---|---|
| 35.    In early April 2018, Cornell began promoting himself on his website (www.urosurgeryhouston.com) as a "Penuma Penile Enhancement Specialist" without authorization. His website further stated that Penuma was "the best method to permanently and safely increase the size of your penis."<br><br>ERS Decl., Exs. A at 215:22-216:8; J; K; GG.<br><br>J. Elist Decl., Ex. B.<br><br>Dr. Elist. Decl. ¶ 29. | |
| 36.    Cornell admitted he is responsible for everything that bears his name on his website.<br><br>ERS Decl. Ex. A at 22:21-25 ("Ultimately I'm responsible for everything that bears my name."). | |
| 37.    Cornell's website included several pages that used the Penuma Mark without authorization.<br><br>J. Elist Decl. ¶ 9, Exs. B & E.<br><br>Dr. Elist. Decl. ¶ 29. | |
| 38.    Cornell used the Penuma Mark in his Google Ads campaigns without authorization.<br><br>ERS Decl..Exs. A at 267:2-268:1 & K. | |

- 9 -

| | |
|---|---|
| J. Elist Decl. ¶¶ 8, 9, & 17, Exs. B, E, & G.<br><br>Dr. Elist. Decl. ¶ 29. | |
| 39.    Cornell instructed his marketing agent, PatientPop, to run ads for his medical practice on Google for searches related to Penuma.<br><br>ERS Decl. Exs. A at 267:2-25, K, & L. | |
| 40.    Cornell's Penuma advertisement was the first result for a Google search using the terms "Penuma" and "Houston".<br><br>J. Elist Decl., Ex. G. | |
| 41.    One of Cornell's Google advertisements read "Robert J. Cornell, MD PA – Penuma Houston" and linked to Cornell's medical practice website (www.urosurgeryhouston.com).<br><br>J. Elist Decl. ¶ 17, Ex. G. | |
| 42.    Cornell's Google Analytics records show his ads using the term "Penuma Houston" generated 1545 impressions, 343 clicks, and 22 conversions for his medical practice website. The Google Analytics records also show that the keywords "+penuma +near +me" generated 19 clicks and 171 impressions. The term "penuma" generation 240 clicks and 3,089 impressions. The terms "+penuma +implant" generated 849 clicks and 9,603 impressions. The terms "+penile +enhancement" generated 98 clicks and 2,414 impressions. | |

| | |
|---|---|
| ERS Decl. Exs. O & Q. | |
| 43.     The Google Analytics records show that Cornell's Google Ads' Ad Group for "Penile Implants & Penuma" lead to 2,729 clicks and 15 online bookings.<br><br>ERS Decl. Ex. P. | |
| 44.     On June 25, 2018, IMD sent Cornell a cease-and-desist email entitled "Unauthorized Penuma Advertisement." IMD demanded that Cornell remove all Penuma-related content from his website and cease and desist from making any further representations regarding Penuma on his website or elsewhere until IMD specifically authorized him to do so in writing.  Cornell received IMD's cease and desist email.<br><br>J. Elist Decl. ¶ 10, Ex. C.<br><br>ERS Decl. Ex. A at 217:8-219:1.<br><br>Dr. Elist. Decl. ¶ 29. | |
| 45.     In the summer of 2018, Duncan Louie, a regional sales director for Gesiva Medical, LLC ("Gesiva"), instructed Cornell to remove references to Penuma from Cornell's medical practice website because Cornell was not authorized to display any Penuma references. Cornell stated he would have his web designer remove them.<br><br>Declaration of Duncan Louie in support of Plaintiffs' Partial Motion for Preliminary | |

| | |
|---|---|
| Injunction (Dkt. 46) "Louie Decl.") ¶ 12. | |
| 46.      In August 2019, Jonathan Elist learned that Cornell's website continued to reference Penuma without authorization. On August 4, 2019, IMD sent a second cease-and-desist email to Dr. Cornell demanding that Cornell refrain from advertising Penuma. Cornell responded that he would confirm any reference that he was offering or will be offering Penuma is removed from his website.<br><br>J. Elist Decl. ¶ 11, Ex. D.<br><br>Dr. Elist. Decl. ¶ 29. | |
| 47.      As of April 2020, Cornell continued to misrepresent himself by stating on his website that he often performed genital contouring "in conjunction with Penuma penile enhancement surgery."<br><br>J. Elist Decl. ¶ 13.<br><br>ERS Decl. Ex. L (Cornell "requested in late April [2020] that we remove this word [Penuma] and anything related to it off the website. We removed it at that time") | |
| 48.      Cornell's Google Ads campaigns continued to run ads for Cornell's medical practice website using the Penuma Mark and targeting searches for "Penuma" until May 2020.<br><br>ERS Decl. Exs. L & O-Q. | |
| 49.      Dr. Clavell is a urologist based in Houston, Texas.  Dr. Clavell is a partner of | |

| | |
|---|---|
| Cornell and shares the same medical office as Cornell.<br><br>ERS Decl. Ex. F at17:6-20 & 25:20-26:12. | |
| 50.     Clavell is the owner of Clavell Urology, PLLC.<br><br>ERS Decl. Ex. F at 17:15-20. | |
| 51.     Dr. Clavell uses the website houstonmenshealth.com for his medical practice.<br><br>J. Elist Decl. ¶ 16, Ex. F.<br><br>ERS Decl. Exs. F at 17:21-23 &132:14-135:8; & R-S. | |
| 52.     Dr. Clavell never received authorization to implant Penuma or advertise using the Penuma Mark on his website or elsewhere.<br><br>J. Elist Decl. ¶ 16.<br><br>ERS Decl. Exs. F at 132:14-135:8, & S. | |
| 53.     Dr. Clavell referred to Penuma on this website in a way that implied he offered Penuma implants to his patients.<br><br>J. Elist Decl. ¶ 16, Ex. F.<br><br>ERS Decl. Exs. F at 132:14-135:8, & S. | |
| 54.     Dr. Clavell deleted the reference to Penuma on his website in late April 2020, on the day he learned he had been named as a defendant in this action. | |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| ERS Decl. Exs. F at 132:14-135:8, & S. | |
| 55.     The first page search results for "Penuma Houston" on Google included results for the medical practice websites of both Cornell and Clavell.<br><br>J. Elist Decl. ¶ 17, Ex. G. | |
| 56.     In the time since Cornell began advertising using the Penuma Mark, Dr. Elist's clinical employees have received dozens of calls and messages from potential patients expressing confusion about whether Cornell offers Penuma.<br><br>Dr. Elist Decl. ¶ 31, Ex. H. | |
| 57.     At least one patient (herein referred to as "John M") saw Dr. Cornell's Penuma advertisements when searching for Penuma online. After seeing the advertisements, the patient booked an appointment with Dr. Cornell to receive a Penuma implant. He expressly stated he wanted a Penuma implant when he booked his appointment with Dr. Cornell's office.  A receptionist from Dr. Cornell's office booked the appointment without informing John M. that Dr. Cornell did not perform Penuma implementation procedures.  John M. visited Dr. Cornell for a Penuma implant consultation. During the appointment, Dr. Cornell dissuaded John M. from obtaining a Penuma implant and placed him on an Augmenta waiting list.<br><br>John M. Decl. ¶¶ 3-6. | |

| | |
|---|---|
| J. Elist Decl. ¶ 18. | |
| 58.    Dr. Cornell maintained a list of at least 55 potential patients for the Augmenta implant.<br><br>ERS Decl. Exs. B at 237:12-238:2; & T.<br><br>John M. Decl. ¶ 6.<br><br>J. Elist Decl. ¶ 19. | |
| **Copyright Infringement** | |
| 59.    In an effort to promote Penuma, Dr. Elist and IMD have developed informational videos designed to explain Penuma and the implant procedure to potential patients.<br><br>Dr. Elist Decl. ¶ 33.<br><br>J. Elist Decl. ¶ 27. | |
| 60.    In October 2014, IMD paid a contractor $1,650 to create an original informational Penuma video ("Penuma Video").<br><br>Dr. Elist Decl. ¶ 34, Ex. I. | |
| 61.    The Penuma video demonstrates a simplified animated version of the Penuma implant procedure, including an animated anatomical image of a penis depicting the placement of a Penuma implant following implantation.<br><br>Dr. Elist Decl. ¶ 34. | |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| J. Elist Decl. ¶ 27. | |
| 62.    In February 2020, at the direction of Dr. Elist, Jonathan Elist applied for copyright registration for the Penuma Video.<br><br>J. Elist Decl. ¶ 29.<br><br>Dr. Elist ¶ 36. | |
| 63.    On April 9, 2020, the U.S. Copyright Office issued the certificate of copyright registration for the Penuma Video. Dr. Elist is the registered owner of the copyright.<br><br>Dr. Elist ¶ 37, Ex. J. | |
| 64.    David Nichols is the director of Huck Medical Technologies, Inc. ("Huck Medical").  Huck Medical included a copy of an image from Penuma Video, with the URL still visible, in a November 2018 PowerPoint presentation created in collaboration with defendant Augmenta, LLC.  The presentation was labeled "Prepared for AM Founders, LLC" and "19th Annual Scientific Meeting of SMSNA." The image from the Penuma Video that was copied is an animated penis that shows where the Penuma is placed following the implant procedure.<br><br>ERS Decl., Exs. D at 189:1-190:5 & 198:10-199:7; & JJ.<br><br>Dkt. 129 ¶ 54. | |
| 65.    On January 3, 2019, Augmenta, LLC filed a patent application that included the | |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| same image from the Penuma Video used by Huck Medical in the November 2018 presentation.  The application matured into United States Patent No. 10,413,413 (the "'413 Patent').  The copied image from the Penuma video is an animated penis that shows where the Penuma is placed following the implant procedure.<br><br>ERS Decl., Exs. A at 248:9-251:4; & U. | |
| 66.    The '413 Patent lists Dr. Cornell, David Nichols, and Hans Mische as the inventors.<br><br>ERS Decl., Exs. A at 248:9-251:4; & U. | |
| 67.    On September 17, 2019, the 413 Patent issued and was published.  It included the copied still image from the Penuma Video.<br><br>ERS Decl., Ex. U. | |
| 68.    On January 3, 2019, Augmenta, LLC filed a second patent application that included the same image from the Penuma Video used by Huck Medical in the November 2018 presentation.  The application matured into United States Patent No. 10,980,639 (the "'639 Patent").  The copied image from the Penuma Video is an animated penis that shows where the Penuma is placed following the implant procedure.<br><br>ERS Decl., Ex. V. | |
| 69.    The '639 Patent lists Dr. Cornell, David Nichols, and Hans Mische as the | |

- 17 -

| | |
|---|---|
| inventors.<br><br>ERS Decl., Ex. V. | |
| 70.    On April 20, 2021, the '639 Patent issued and was published.  It included the copied still image from the Penuma Video.<br><br>ERS Decl., Ex. V. | |
| 71.    Dr. Cornell, David Nichols, and Hans Mische did not receive authorization to copy and publish any portion of the copyrighted Penuma Video.<br><br>Dr. Elist Decl. ¶ 35.<br><br>J. Elist Decl. ¶ 28. | |
| **Dr. Cornell's Work with Penuma and Augmenta** | |
| 72.    On January 11, 2018, Cornell, a Houston based urologist, contacted Gesiva Medical, LLC ("Gesiva"), the sole distributor of Penuma, to express interest in receiving Penuma training. Cornell stated he had "several patients express a desire to both learn about [the Penuma] product with a real interest in moving forward." Duncan Louie, a Gesiva representative, coordinated with Dr. Cornell to schedule Dr. Cornell's first Penuma training session.<br><br>ERS Decl. Ex. W.<br><br>Dr. Elist Decl. ¶ 26.<br><br>Louie Decl. (Dkt. 46) ¶ 4. | |

- 18 -

| | |
|---|---|
| 73.     Prior to Cornell's Penuma training session, Cornell had no experience with cosmetic penile implants.  He had not performed a cosmetic penile implant procedure, he had not observed a Penuma implant procedure, and he had not inspected or held a Penuma implant.<br><br>ERS Decl. Exs A at 123:8-21, 130:21-131:1, 138:2-15; & X at Response to Special Interrogatory No. 8 ("Defendants have not performed any Cosmetic Penile Implant procedures."). | |
| 74.     Prior to Cornell's Penuma training session with Dr. Elist, Cornell's surgical experience was largely with inflatable and non-inflatable penile implants to treat erectile dysfunction.<br><br>ERS Decl. Ex A at 27:14-28:1. | |
| 75.     Dr. Cornell's first and only Penuma training session was on March 30, 2018. He was accompanied by Louie.<br><br>ERS Decl. Ex A at 156:16-24 & 161:5-10.<br><br>Louie Decl. (Dkt. 46) ¶ 5.<br><br>Dr. Elist. Decl. ¶¶ 27-29.<br><br>J. Elist Decl. ¶ 6. | |
| 76.     IMD's practice is to require all surgeons participating in Penuma training to sign a non-disclosure agreement upon arrival to Dr. Elist's Beverly Hill's surgery center. | |

- 19 -

| | |
|---|---|
| J. Elist Decl. ¶ 7.<br><br>Dr. Elist. Decl. ¶ 25. | |
| 77.    On March 30, 2018, Dr. Cornell entered into a non-disclosure agreement with IMD ("Penuma NDA").<br><br>ERS Decl. Exs A at 160:7-161:10; & Y.<br><br>Dr. Elist Decl. ¶ 26, Ex. F. | |
| 78.    The Penuma NDA defines "Confidential Information" as "various information or material in paper, verbal and/or electronic form, which relates to past, present or future products, services, software, techniques or proformas relating to the business affairs, plans and operations [] of [IMD] for purposes of discussing and proposing terms of a possible agreement/collaboration (the "Transactions")."<br><br>The Penuma NDA further provides that "[a]s used herein, 'Confidential Information' shall not include information which (a) was or becomes generally available to the public other than as a result of disclosure by the Receiving Party; (b) can be proved that it was information already known by the Receiving Party prior to disclosure by the Disclosing Party; (c) was independently developed or acquired by the Receiving Party without violation of this Agreement; or (d) must be disclosed by Receiving Party if required by law or a court of competent jurisdiction." | |

| | |
|---|---|
| Dr. Elist Decl. ¶ 26, Ex. F.<br><br>ERS Decl. Ex Y. | |
| 79.    Under the Penuma NDA, Dr. Cornell agreed that he would "protect and hold in the strictest confidence the Confidential Information; [] not disclose any Confidential Information to any person or entity, unless required by law or other regulatory authority, without the prior written consent of" IMD; and "not use directly or indirectly the Confidential Information for [his] own benefit".<br><br>Dr. Elist Decl. ¶ 26, Ex. F.<br><br>ERS Decl. Ex Y. | |
| 80.    Under the Penuma NDA, Dr. Cornell "acknowledge[d] that the Confidential Information is confidential and that any disclosure or use of Confidential Information… may cause serious harm or damage to the Disclosing Party."<br><br>Dr. Elist Decl. ¶ 26, Ex. F.<br><br>ERS Decl. Ex Y. | |
| 81.    On March 30, 2018, as part of his Penuma training, Dr. Cornell observed at least four Penuma implant operations performed by Dr. Elist in Beverly Hills, California.<br><br>ERS Decl. Ex. B at 70:4-80:5.<br><br>Dr. Elist Decl. ¶ 27, Ex. G. | |

| | |
|---|---|
| J. Elist Decl. ¶ 8. | |
| 82. After Dr. Cornell's March 30, 2018, Penuma training session, and at Dr. Cornell's request, Duncan Louie sent Dr. Cornell a copy of the surgical instruments and supplies list for the Penuma implant procedure ("Penuma Instrument and Supply List") on April 2, 2018. Dr. Cornell handwrote a note on the list that stated, "Provided by Penuma sales rep at my [Cornell's] request 4/02/2018." <br><br> ERS Decl. Exs A at 163:8-165:16; & Z. <br><br> Louie Decl. (Dkt. 46) ¶ 10. <br><br> Dr. Elist Decl. ¶ 30. <br><br> J. Elist Decl. ¶ 14. | |
| 83. The Penuma Instrument and Supplies List that Louie sent to Cornell was created by Dr. Elist for the Penuma implant procedure based on Dr. Elist's years of experience performing the procedure. <br><br> Dr. Elist Decl. ¶ 16. <br><br> See Louie Decl. (Dkt. 46) ¶ 10. | |
| 84. Dr. Elist and IMD have not publicly shared the Penuma Instrument and Supplies List. IMD maintains it as confidential. IMD authorized Gesiva, which is also subject to a non-disclosure agreement, to send the list only to surgeons who have started Penuma training and who have signed the required | |

| | |
|---|---|
| non-disclosure agreement.<br><br>Dr. Elist Decl. ¶¶ 16, Ex. E.<br><br>Louie Decl. (Dkt. 46) ¶ 2 (as a Gesiva employee, Louie is subject to a non-disclosure agreement). | |
| 85.    A few days after attending the Penuma training with Dr. Elist in Beverly Hills, Dr. Cornell began working with a medical device engineer Hans Mische to develop his own cosmetic silicone penile implant.<br><br>ERS Decl. Ex A at 50:13-51:3; 171:19-172:8. | |
| 86.    On April 9, 2018, Dr. Cornell sent a copy of Penuma's Instrument and Supply List to Hans Mische without IMD's consent. The email was titled "Ellis [sic] Pick List."<br><br>ERS Decl. Ex GG.<br><br>Dkt. 139 ¶ 23.<br><br>Dr. Elist Decl. ¶ 30.<br><br>J. Elist Decl. ¶ 14. | |
| 87.    Sometime after April 23, 2018, Dr. Cornell informed Louie that he did not intend to return to Beverly Hills for additional Penuma training.<br><br>ERS Decl. Ex A at 166:2-168:4.<br><br>Louie Decl. (Dkt. 46) ¶ 13. | |

| | |
|---|---|
| 88.    Dr. Cornell did not return the Penuma Instrument and Supply List to IMD when he decided not to pursue further Penuma training.<br><br>J. Elist Decl. ¶ 15.<br><br>Dr. Elist Decl. ¶ 30. | |
| 89.    After attending Penuma training and entering the Penuma NDA, Dr. Cornell worked with numerous individuals, including Hans Mische, to design a competing silicone implant, referred to as Augmenta.<br><br>ERS Decl. Ex A at 49:24-52:25, 77:1-7, & 85:13-21. | |
| 90.    Cornell took handwritten notes during his Penuma training visit while he observed Dr. Elist implant Penuma. Cornell later shared those notes with Hans Mische and David Nichols, two engineers assisting him with Augmenta<br><br>*See* Declaration of Dr. Robert Cornell in support of Opposition to Motion for Preliminary Injunction (Dkt. 59-1), Exhibit A.<br><br>ERS Decl. Ex. C at 186:6-187:3. | |
| 91.    On January 13, 2020, Dr. Cornell through Augmenta, LLC applied for FDA 510(k) clearance for the Augmenta implant.  The application remains pending, | |

| | |
|---|---|
| but if granted, the Augmenta will directly compete with the Penuma implant.<br><br>ERS Decl. Exs. C at 172:21-173:6, & G. | |
| **Dr. Wang's Work with Penuma and Augmenta** | |
| 92.   Dr. Wang was a member of the Penuma advisory board and a consultant for IMD between October 2017 and August 2020.<br><br>ERS Decl. Ex. AA ¶ 3.<br><br>Dr. Elist Decl. ¶ 18.<br><br>J. Elist Decl. ¶¶  5, 20, Ex. H. | |
| 93.   Advisory board members were given access to Plaintiffs' confidential information in order to provide guidance and create a surgeon training program. Thus, all consultants on IMD's Penuma advisory board were required to enter into an agreement with a strict confidentiality term.<br><br>Dr. Elist Decl. ¶ 18.<br><br>J. Elist Decl. ¶ 20, Ex. H. | |
| 94.   Dr. Wang entered into a Consulting Services Agreement with IMD on October 6, 2017.<br><br>ERS Declaration Ex. E 191:12-24.<br><br>J. Elist Decl. ¶ 20, Ex. H. | |

| | |
|---|---|
| 95.    The Consulting Services Agreement defines "Confidential Information" as "Any information Consultant acquires from Company, the terms of this Agreement, and any material, information, data, and devices developed in the course of performing the Consulting Services" unless it (a) "becomes publicly available through no fault of Consultant"; (b) is "[r]eleased by Company in writing"; or (c) is "[l]awfully obtained from third parties without restriction."<br><br>J. Elist Decl., Ex. H. | |
| 96.    The Consulting Services Agreement requires that Confidential Information "be maintained in the strictest confidence and not used by Consultant or disclosed to or used by any of Consultant's employees, agents or assistants, except as necessary to perform the Consulting Services."<br><br>J. Elist Decl., Ex. H. | |
| 97.    The Consulting Services Agreement provided that "Consultant shall not disclose any Confidential Information to Consultant's agents, or to any third party who is not an employee, without first obtaining the prior written consent of Company."<br><br>J. Elist Decl., Ex. H. | |
| 98.    Under the Consulting Services Agreement, Dr. Wang acknowledged that he would "be given access to substantial and significant Company Confidential Information and trade secrets" and that | |

| | |
|---|---|
| IMD would suffer irreparable harm if the information was disclosed and used for the benefit of any of Company's competitors.<br><br>J. Elist Decl., Ex. H. | |
| 99.    Under the Consulting Services Agreement, to protect Confidential Information and trade secrets, Dr. Wang agreed not to "serve as a researcher, investigator, consultant, employee, or independent contractor, or in any other way perform services to or for the benefit of, any third party regarding the areas involved in this agreement."<br><br>J. Elist Decl., Ex. H. | |
| 100.   Under the Consulting Services Agreement, IMD "retain[ed] Dr. Wang to provide assistance in developing strategies and tactics that may be used to educate providers about the Silicone Block Penile Implant [Penuma] and address challenges they may encounter when using the implant."<br><br>J. Elist Decl., Ex. H. | |
| 101.   Under the Consulting Services Agreement, Wang agreed "to assign to" IMD any ideas, inventions, improvements, or suggestions" that resulted due to Wang's role as an IMD advisor and consultant.<br><br>J. Elist Decl., Ex. H. | |
| 102.   IMD paid Dr. Wang for the services her rendered under the Consulting Services Agreement. | |

| | |
|---|---|
| ERS Declaration Ex. E at 194:25-196:4.<br><br>Jon Elist Decl. ¶ 25, Ex. J. | |
| 103.   On October 25, 2017, Dr. Wang attended the first Penuma advisory board meeting.<br><br>J. Elist Decl. ¶ 21. | |
| 104.   On January 2018 and April 26, 2018, Dr. Wang traveled to Beverly Hills, California to observe Dr. Elist perform Penuma implant procedures in Beverly Hills, California.<br><br>ERS Declaration Exs. E at 196:2-22; & AA.<br><br>J Elist Decl. ¶ 22, Ex. J.<br><br>Dr. Elist Decl. ¶ 20. | |
| 105.   As an advisory board member, Dr. Wang co-authored an academic paper on Penuma and exchanged communications regarding Penuma's FDA clearance. Dr. Wang also attended an advisory board meeting in which indications for use for Penuma were discussed.<br><br>Dr. Elist Decl. ¶ 19.<br><br>J. Elist Decl. ¶ 21. | |
| 106.   Dr. Wang entered into an Amendment to the Consulting Services Agreement with IMD on June 8, 2018. | |

| | |
|---|---|
| ERS Declaration Ex. E at 197:12-18.<br><br>J Elist Decl., Ex. I. | |
| 107.   The Amendment to the Consulting Services Agreement stated that IMD wished to retain "Dr. Run Wang to both observe and assist with cases in order to help establish a physician training program" and "to develop a protocol for a registry that will allow for prospective analysis of any appropriate pool of data to help the urology opinion leaders to evaluate the risks and benefits ass ociated with the Penuma Silicone Block Penile Implant procedure and for Dr. Run Wang to support the collection of data for the registry from the first series of cases conducted in his clinic."<br><br>J Elist Decl. Ex. I. | |
| 108.   Dr. Wang was paid under the Amendment to the Consulting Services Agreement.<br><br>ERS Decl. Ex. E at 197:12-198:16.<br><br>J. Elist Decl. ¶ 25. | |
| 109.   In his role as a Penuma advisory board member and IMD consultant, Dr. Wang had access to the Penuma procedure instrument and supplies list.  He also had access to IMD's draft versions of research protocols, Penuma articles, and a confidential set of surgical notes.<br><br>J. Elist Decl. ¶ 24, Ex. K. | |

- 29 -

| | |
|---|---|
| Dr. Elist Decl. ¶ 19, 21. | |
| 110.   On April 17, 2019, Dr. Elist proctored the first Penuma case performed by Dr. Wang in Dr. Wang's operating room, which completed Dr. Wang's Penuma training.<br><br>Dr. Elist Decl. ¶ 22.<br><br>J. Elist Decl. ¶ 23.<br><br>ERS Declaration Exs. E at 21:18-22:5; & AA. | |
| 111.   Dr. Wang has personally implanted between 10-15 Penuma implants in live patients, the most recent of which occurred before August 2020.<br><br>ERS Declaration Ex. E at 21:18-22:5. | |
| 112.   Dr. Wang entered into a mutual non-disclosure agreement with Augmenta Investors LLC on November 6, 2018.<br><br>ERS Declaration Exs. E at 66:17-25; & DD. | |
| 113.   Dr. Wang began working with Dr. Cornell and Augmenta in late 2018 while he was still serving as a consultant to Penuma.  Dr. Wang did not disclose this to IMD or receive IMD's consent to do so.<br><br>ERS Declaration Ex. E at 130:17-131:15. | |
| 114.   Dr. Wang began working with Cornell on developing the Augmenta cosmetic silicone penile implant after | |

- 30 -

| | |
|---|---|
| entering into the Consulting Services Agreement and while he remained a Penuma advisory board member.<br><br>ERS Declaration Ex. E at 130:17-131:15.<br><br>J. Elist Decl. | |
| 115.   Dr. Wang performed a cadaver study for the Augmenta implant in December 2018.<br><br>ERS Declaration Exs. E at 70:8-23; & EE. | |
| 116.   Dr. Wang provided an assessment of the Augmenta implant insertion procedure and commented that the design of the Augmenta implant may make it too heavy.<br><br>ERS Declaration Ex. E at 79:9-87:23 & 98:4-11; & Exhibit FF at No. 4. | |
| 117.   Dr. Wang provided substantive design feedback and assisted with Augmenta's development. This included conducting an Augmenta cadaver implementation to validate Augmenta's desired surgical technique for implementation; providing feedback on the design of the tip of the Augmenta implant; reviewing Augmenta's patient selection criteria and perioperative protocols; provided feedback on the use of the mesh in the Augmenta design; and connected Cornell to a company that could assist in obtaining Chinese regulatory clearance.<br><br>ERS Decl., Exs. A 60:5-61:2 & 126:7-19; E at 229:16-234:19; H (commenting on | |

| | |
|---|---|
| Wang's "invaluable design input"); I; BB; CC; & EE. | |
| 118.   Dr. Wang is the sole owner of RW Global Men's Health Consultation Services, PLLC.<br><br>ERS Declaration Ex. E at 53:2-7. | |
| 119.   Dr. Wang, through RW Global Men's Health Consultation Services, PLLC, received what amounted to a 1% share in Augmenta LLC as consideration for his contributions to the design of the Augmenta implant.<br><br>ERS Declaration Ex. E at 55:21-25. | |
| 120.   Dr. Wang expressed concern over the design of the Augmenta Implant because the use of the mesh could limit expansion and cause issues with re-do surgery.<br><br>ERS Declaration Exs. E at 103:1-107:22; & GG. | |
| 121.   Dr. Wang introduced Defendants Cornell and Finger to a Happiness Works representative.  Happiness Works is a company that could assist Defendants in obtaining Chinese regulatory clearance for the Augmenta Implant.<br><br>ERS Declaration Exs. E at 229:16-234:19; & HH. | |

| | |
|---|---|
| 122.   On July 30, 2019, Dr. Wang returned to Beverly Hills, upon his own request, to observe more Penuma cases.<br><br>Dr. Elist Decl. ¶ 23.<br><br>J. Elist Decl. ¶ 24. | |
| 123.   Dr. Wang did not disclose his work with Augment to Dr. Elist or IMD before February 2020.<br><br>Dr. Elist Decl. ¶ 24.<br><br>J. Elist Decl. ¶ 26. | |
| 124.    In February 2020, Dr. Elist learned Dr. Wang was listed as CEO of Augmenta, LLC on the Augmenta website.<br><br>Dr. Elist Decl. ¶ 24.<br><br>J. Elist Decl. ¶ 26. | |

## CONCLUSIONS OF LAW

| Conclusion of Law | Authority |
|---|---|
| **Legal Standard** | |
| 1. Under Fed. R. Civ. Proc. 56, a party is entitled to move for summary judgment of an entire claim or for summary adjudication "to determine certain facts or elements of a claim as established" for trial. | *Magic Link Garment Ltd. v. ThirdLove, Inc.*, 445 F. Supp. 3d 346, 355 (N.D. Cal. 2020); *see also Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 n.9 (9th Cir. 2009). |

| | |
|---|---|
| 2. Because a court can adjudicate individual elements of a claim, it is proper to grant summary adjudication "on the issue of liability alone, even when there is an issue to the amount of damages[.]" | *Markos v. Sears Roebuck & Co.,* No. CV-53051CBM(SSx), 2017 WL 5162458, at *3 (C.D. Cal., Feb. 13, 2017). |
| 3. The standard for summary adjudication is identical to the standard for summary judgment. | *Time Warner Ent.- Advance/Newhouse P'ship v. Steadfast Orchard Park, L.P.*, No. EDV 07-472-VAP(OPX), 2008 WL 4350054, at *6 (C.D. Cal., Sept. 23, 2008). |
| 4. A party is entitled to move for judgment as a matter of law when admissible evidence establishes that "there is an absence of genuine issues of material facts." A fact is material when it "might affect the outcome of the suit under governing law" and an issue is genuine "only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." | *Double Zero v. TJX Companies*, No. CV 10-5241 CBM(JCGX), 2011 WL 13217235 at *1 (2011); *see also* Fed. R. Civ. P. 56(a). |
| **Trademark** | |
| 5. Trademark infringement liability arises when a party "use[s] in commerce any reproduction, counterfeit copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods . . .[where] such use is likely to cause confusion . . . or deceive." 15 U.S.C. § 1114(1)(a). | 5 U.S.C. § 1114(1)(a). |

| 6. | Plaintiffs must demonstrate that (1) their mark is protected; (2) Defendants used Plaintiffs' mark in commerce; and (3) in a manner likely to cause confusion. | *Ossur hf v. Manamed Inc.*, 331 F. Supp. 3d 1005, 1011 (C.D. Cal. 2017). |
|---|---|---|
| 7. | "When proof of registration is uncontested, the ownership interest element . . . is met." | *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014). |
| 8. | Use of mark on website and as a Google ads keyword to target users constitutes using the mark in commerce. | *Fin Ex. LLC v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2008); *see also Network Automation, Inc. v. Concepts, Inc.* 638 F.3d 1137, 1144-45 (9th Cir. 2011) (same). |
| 9. | The test for consumer confusion is "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing the mark." | *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). |
| 10. | Confusion "results when a consumer seeks a particular trademark holder's product and instead is lured to the produce of a competitor by the competitor's use of the same or similar mark." "Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor. In that way, the competitor has captured the trademark holder's potential visitors and customers." | *Williams-Sonoma, Inc. v. Amazon.com, Inc.*, 2019 WL 7810815, at *7 (N.D. Cal., May 2, 2019) (quoting *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006)); *see also Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004). |
| 11. | Courts examine the totality of the circumstances to determine whether a mark is used "in a way sufficiently public to identify or distinguish the | *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1052 (9th Cir. 1998); *see also VersaTop Support Sys., LLC* |

- 35 -

| | |
|---|---|
| marked goods in an appropriate segment of the public mind as those of the adopter of the mark." | *v. Ga. Expo, Inc.*, 921 F.3d 1364, 1371-72 (Fed. Cir. 2019) ("use in commerce" element met by use of competitor's marks in "advertising and brochures"). |
| 12. The Ninth Circuit applies the "Sleekcraft factors" to determine whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused. | *Brookfield*, 174 F.3d at 1054; *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). |
| 13. Two particularly probative factors are the similarity of the marks and the proximity of the goods. | *Synoptek, LLC v. Synaptek Corp.*, 309 F. Supp. 3d 825, 836 (C.D. Cal. 2018); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632-33 (9th Cir. 2008) (the Ninth Circuit applies "all the relevant factors, noting that a final likelihood of confusion determination may rest on those factors that are of the most relative importance in any particular case.") (citing *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631-34 (9th Cir. 2005)). |
| 14. The stronger the mark, the more protection it is afforded. The strongest marks that receive the maximum trademark protection are "arbitrary" or "fanciful." | *Sleekcraft*, 599 F.2d at 349; *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). |
| 15. Goods or services are close in proximity or related where they are complementary, sold to the same class of purchasers, or are similar in use or function. | *Sleekcraft*, 599 F.2d at 350; *see also Synoptek*, 309 F. Supp. 3d at 838 (related goods or services are those "reasonably thought by the buying public to come from the same source if sold under the same |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| | mark") |
| 16. The greater the similarity between the two marks at issue, the greater the likelihood of confusion. | *Synoptek,* 309 F. Supp. at 836, *citing GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). |
| 17. Similarity in either form, spelling, or sound alone may be sufficient to support a finding of likelihood of confusion. | *Synoptek,* 309 F. Supp. 3d at 837-38; *see also* TMEP § 1207.01(c)(ii) (8th ed. Oct. 2018) (citing *In re Viterra Inc,* 671 F.3d 1358, 1366 (Fed. Cir. 2012). |
| 18. A showing of "actual confusion" constitutes "persuasive proof that future confusion is likely." However, evidence of actual confusion is not required to show a likelihood of confusion. | *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 845 (9th Cir. 1987); *Network Automation, Inc. v Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011); *see also Sleekcraft,* 599 F.2d at 352 (producing proof of "actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial."). |
| 19. The internet is a factor "that courts have consistently recognized as exacerbating the likelihood of confusion." | *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d at 1207. |
| 20. "[V]irtually no amount of consumer care can prevent confusion where two entities have the same name." | *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001) ("it is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination that would enable him or her to discern the difference between "Livewire" and "Live Wire."). |

| | |
|---|---|
| 21. When the alleged infringer intended to deceive customers, courts infer that its conscious attempt to confuse did in fact result in confusion. | *Stone Creek, Inc. v. Ominia Italian Design, Inc.* 875 F.3d 426, 434 (9th Cir. 2017). |
| 22. Where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark, resolution of this factor favors the plaintiff. | *Sanrio, Inc. v. Ronnie Home Textile, Inc.*, 2016 WL 5956096, at *11 (C.D. Cal., Jan. 5, 2016). |
| 23. A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. | *Electropix*, 178 F. Supp. 2d at 1135 (citing *Sleekcraft*, 599 F.2d at 354 (internal citations omitted)). |
| 24. When likelihood of confusion is established, "[i]rreparable harm to reputation and goodwill is presumed as a matter of law" and permanent injunctive relief is appropriate. | *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074-75 (C.D. Cal. 2004); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.)" |
| 25. Damages are typically measured by any direct injury which a plaintiff can prove, and are permitted "based on the totality of the circumstances." | *Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1139 (N.D. Cal. 2008). |
| 26. A plaintiff need not prove actual damages to prevail on a trademark | *See R/C Theatres Mgmt. Corp. v. Metro Movies, LLC*, 44 F. Supp. 3d 626, 636 (D.C. Md. 2014). |

| | |
|---|---|
| infringement claim. | (plaintiff prevailing on the merits of a trademark "need not prove actual damages" and was entitled "to at least nominal damages"). |
| **Counterfeit Mark** | |
| 27. Counterfeiting under the Lanham Act arises where a defendant "counterfeit[s] a registered mark in connection with the sale, offering for sale, distribution, or advertising of goods or services where it is likely to cause confusion in consumers." | *Williams-Sonoma v. Amazon.com, Inc.*, 2019 WL 7810815, at *3 (N.D. Cal., May 2, 2019). |
| 28. A counterfeit is a "spurious mark which is identical with, or substantially indistinguishable from a registered mark." | 15 U.S.C. § 1127. |
| 29. "[A] counterfeit claim is merely the hard core or first degree of trademark infringement, and there is nothing in the statutory language of Section 1114 that suggests that a counterfeit claim should be construed any differently from an infringement claim." | *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079 (9th Cir. 2020) (quoting *Gibson Brands, Inc. v. John Hornby Skewes & Co.*, 2016 WL 7479317, at *5 (C.D. Cal., Dec. 29, 2016) (internal citations omitted). |
| 30. "[C]ounterfeiting need not always involve the use of a trademark in connection with the sale of the counterfeiter's manufactured good that it attempts to pass off as goods made by the trademark owner, and may involve the use of service marks." | *Williams-Sonoma*, 2019 WL 7810815, at *3 |
| 31. "[A] plaintiff may recover statutory damages whether or not there is adequate evidence of the actual damages suffered by the plaintiff or of the profits reaped by defendant." | 15 U.S.C. § 1117; *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 614-15 (C.D. Cal. 2017) (citing *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, |

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION

| | |
|---|---|
| | 1337 (9th Cir. 1990) (alteration in original)); *New Form, Inc. v. Tekila Films, Inc.*, 357 Fed. Appx. 10, 11–12 (9th Cir. 2009) ("[t]here is no required nexus between actual and statutory damages") |
| **Copyright** | |
| 32. To prevail on a copyright infringement claim, a plaintiff must establish "(1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." | *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2000). |
| 33. Under Section 410(c) of the Copyright Act, a copyright certificate constitutes prima facie evidence of the validity of the copyright. | *Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1194 (C.D. Cal. 2005). |
| 34. A plaintiff does need not to prove the defendant intended to infringe the copyright to prevail on summary judgment.<br>35. | *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.,* 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006); *Educ. Testing Servs. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) (copyright infringement "is a strict liability tort"). |
| **Contract** | |
| 36. Courts may resolve certain breaches as a matter of law on summary adjudication. | *BlueGEM Sec., Inc. v. Trend Micro Inc.*, No. CV09-1492 ODW (FFMX), 2010 WL 11505702, at *17 (C.D. Cal. June 8, 2010) (granting in part a motion for summary judgment on one breach of contract; allowing trial of other breaches based on different facts). |

- 40 -

| | |
|---|---|
| 37. Every contract imposes on each party a duty of good faith and fair dealing in each performance and its enforcement." | *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012) (internal quotation marks omitted). |
| 38. The implied covenant of good faith and fair dealing s based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. | *Rosenfeld v. JP Morgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) |

Dated: September 14, 2021          WAYMAKER LLP


By:   */s/ Ryan G. Baker*
        Ryan G. Baker
        *Attorneys for Plaintiffs,*
        *INTERNATIONAL MEDICAL DEVICES,*
        *INC., MENOVA INTERNATIONAL, INC.,*
        *and JAMES ELIST, M.D.*

PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW ISO MOTION FOR SUMMARY ADJUDICATION