1  **GLANCY PRONGAY & MURRAY**
2  Kevin Ruf (State Bar No. 136901)
   *kruf@glancylaw.com*
3  1925 Century Park East, Suite 2100
4  Los Angeles, CA 90067
  Telephone: (310) 201-9150
5  Facsimile: (310) 201-9160

6  **AHMAD, ZAVITSANOS & MENSING P.C.**
7  John Zavitsanos (admitted pro hac vice)
   *jzavitsanos@azalaw.com*
8  Foster Johnson (State Bar No. 289055)
9     *fjohnson@azalaw.com*
  Shahmeer Halepota (admitted pro hac vice)
10     *shalepota@azalaw.com*
11  Alexander Dvorscak (admitted pro hac vice)
   *advorscak@azalaw.com*
12  1221 McKinney Street, Suite 2500
13  Houston, Texas 77010
  Telephone: (713) 655-1101
14  Facsimile: (713) 655-0062
15  *Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL MEDICAL DEVICES, INC., *et al.*,<br>    Plaintiffs,<br>v.<br>ROBERT CORNELL, *et al.*,<br>    Defendants. | Case No. 2:20-cv-03503-CBM (RAOx)<br><br>**AMENDED DECLARATION OF ROBERT J. CORNELL IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' *EX PARTE* APPLICATION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE COURT'S PRELIMINARY INJUNCTION**<br><br>The Honorable Consuelo B. Marshall |

AMENDED DECLARATION OF ROBERT J. CORNELL, M.D.

# AMENDED DECLARATION OF ROBERT J. CORNELL, M.D.

I, ROBERT J. CORNELL, declare as follows:

1. I submit this Amended Declaration in support of Defendants' Response in Opposition to Plaintiffs' *Ex Parte* Application for An Order to Show Cause Why Defendants Cornell, Wang, and Clavell-Hernandez Should Not Be Held in Contempt for Violating the Preliminary Injunction Order submitted in this above-captioned case. I have personal knowledge of the facts set forth herein. If called upon as a witness, I could and would testify competently thereto.

2. I am the founder and CEO of Augmenta, LLC. As the CEO of Augmenta, LLC, I am familiar with and knowledgeable about the business operations of the company, including its efforts to market products.

3. Since the Court issued the Preliminary Injunction in this case, we have made every effort to comply with the injunction terms. I describe several examples of our compliance efforts below.

4. We have shut down the Augmenta website. The website, and all of the materials about Augmenta, are not publicly accessible.

5. We have not created or disseminated any marketing materials, either written or electronic, to promote Augmenta commercially to any potential customers, including any patients or physicians.

6. Neither I, nor anyone else on Augmenta's behalf, have attempted to sell an Augmenta implant to any potential patients.

7. Neither I, nor anyone else on Augmenta's behalf, have attempted to sell an Augmenta implant to any potential doctors or surgeons.

8. Despite that we are a nascent company with no source of revenue and no FDA-cleared product for sale, we have also ceased fundraising for Augmenta, LLC. We have refrained from raising any money despite the mounting legal expenses we face from this lawsuit.

9. Since the Preliminary Injunction has issued in this case, Plaintiffs have harassed us with repeated allegations that we have violated the injunction's terms. Although we did not agree with these allegations, we have always made good-faith efforts to resolve Plaintiffs' concerns where possible.

10. For example, Plaintiffs complained about a Facebook group that discussed Augmenta. That Facebook group was a private group of two members, with no publicly accessible social media posts, and was not created by me or anyone else acting on Augmenta's behalf. Nevertheless, I reached out to the creator of the group, Ms. Erica Ostaszewski, and requested that she delete the group to resolve Plaintiffs' concerns. I was able to convince Ms. Ostaszewski to do so.

11. In another example, Plaintiffs complained that a tweet I had posted was a violation of the Preliminary Injunction. Although I disagreed that a single, undeleted tweet constituted a violation, nevertheless, I deleted that tweet and my entire Twitter account to moot the allegation from Plaintiffs.

12. In sum, not only have we taken numerous, proactive actions to ensure compliance with the Preliminary Injunction, we have been responsive every time Plaintiffs alleged that we were not in compliance. And each time, we have made good-faith efforts to resolve Plaintiffs' concerns regardless of whether we agreed with the merits of Plaintiffs' suggestions.

13. Yet, after giving us one day's notice, on Wednesday, November 24, 2021, the day before Thanksgiving, Plaintiffs filed a motion to hold myself, Dr. Clavell, and Dr. Wang in contempt, seeking sanctions as draconian as imprisonment. I understand that this time, Plaintiffs' allegations are based on an academic article about a cadaver study that had been published since October.

14. In December of 2018, I, along with four other doctors, conducted a study of the Augmenta implant using cadaver specimens to evaluate structural changes caused by the implant. The doctors involved were me, Dr. Clavell-

1  Hernandez, Dr. Tatem, Dr. Lipshultz, and Dr. Wang. As a result of that study, we
2  were able to gather clinical safety data on the Augmenta implant.
3        15.    After the study, the doctors who were involved began working on a
4  scientific article to summarize and discuss our findings from the Augmenta cadaver
5  studies and its implications. That is a typical part of the process associated with
6  research during the development of new medical devices. The five doctors who
7  participated in the study co-authored the article.
8        16.    The journal that decided to publish our article was titled *Sexual*
9  *Medicine*, which is an official publication of the International Society for Sexual
10 Medicine. The article was published after the journal's peer review process, which I
11 understand is conducted by other independent urologists.
12       17.    By submitting our findings to academic journals for peer review and
13 publication, it was not our intention to commercialize or promote Augmenta for the
14 market in any way. The *Sexual Medicine* journal is a scientific and academic
15 publication. It is not a marketing platform in any way.
16       18.    Neither I, nor anyone acting on Augmenta's behalf, have asked the
17 *Sexual Medicine* journal to specifically market or promote Augmenta to any patients
18 or doctors for sale.
19       19.    We have created zero marketing or promotional materials for
20 Augmenta based on the *Sexual Medicine* article on our cadaver study. We have not
21 sent out a single marketing or promotional correspondence regarding Augmenta to
22 any potential customers that rely on or reference the article. Additionally, we have
23 never presented the article at a medical conference, nor have we sold any Augmentas
24 based on the article (in fact, Augmenta's total sales to date are zero).
25       20.    In sum, neither I, nor anyone on Augmenta's behalf, have used this
26 article on the findings of our cadaver study to promote or market Augmenta for sale
27 to any potential customers in any way.
28

21. Our only intended consequence of the article, which was related to the business of Augmenta, LLC, was a hope that the article could enhance our chances of obtaining clearance for the Augmenta implant.

22. Our 510(k) submission to the FDA has been pending for nearly two years. During that time, the agency has repeatedly raised concerns and requested additional data; and in doing so, echoed allegations of safety concerns that I understand originated from Plaintiffs in this case.

23. I understood that the FDA could look favorably upon peer-reviewed clinical data and analysis that was published in a reputable source in the urological field. Because we do not currently have FDA clearance to use Augmenta on actual patients, our most effective (and realistically only) method to gather clinical field data was via an academic study using cadaveric models.

24. By submitting the data gathered from our cadaver study to a peer-reviewed publication, we did hope to positively influence the outcome of our pending FDA 510(k) application for clearance.

25. Specifically, I understand that physicians associated with IMD, Drs. Kambiz Tajkarimi and Laurence Levine, have alleged that the mesh tabs in the Augmenta implant could constrict erection and result in complications during removal of the implant.

26. As an initial matter, neither Dr. Tajkarimi nor Dr. Levine has ever implanted an Augmenta, or participated in any study, testing, or any other empirical evaluation of the safety or efficacy of Augmenta in any way.

27. Moreover, the findings and analyses in our article, peer-reviewed and published in the *Sexual Medicine* journal, refute both of these allegations.

28. Regarding the allegation of erection constriction, our cadaver study findings showed no such constriction from the mesh tabs in the Augmenta implant. Indeed, the data we gathered demonstrated precisely the opposite — erect penile

length *increased* on average from 12.5 +/- 1.3 cm to 13.6 +/- 1.8cm which represented an increase of 9.7%.

29. Regarding IMD's allegation that the mesh tabs design caused removal of the Augmenta implant to be potentially unsafe, we also put forth in the article our analysis about implant removal as reproduced below:

> Implant removal can therefore be facilitated through a penos-scrotal incision ventrally, avoiding dissection of tissue planes associated with the dorsal neurovascular bundle. Moreover, the strategic placement of the anchoring mesh tabs of the Augmenta CPI similarly avoids dissection involving the urethra more medially or the deeper corporal bodies. The hydrophilic coating covering the entire surface of the implant should also minimize scar tissue formation or adhesions to the overlying skin hence, facilitating device removal and mitigating cosmetic complications associated to device explanation.

30. Submitting our article to a reputable journal, especially one such as *Sexual Medicine* which is subspecialty specific for urology and sexual medicine, allows other, independent urologists to peer review our work, including our findings and analyses regarding post-operative erect length and regarding implant removal.

31. It was my understanding that the Court's Preliminary Injunction did not prohibit us from pursuing FDA clearance for the Augmenta implant. Therefore, neither I, nor anyone associated with Augmenta to my knowledge, imagined that the Plaintiffs would suggest that submitting our research for academic publication, which could only enhance Augmenta's business by potentially enhancing our chance of FDA clearance, would constitute a violation of the Preliminary Injunction.

32. I understand that one issue Plaintiffs raised was a correction of the article. While I do not believe Plaintiffs ever articulated the specific correction(s) that they wish for us to make, from review of Plaintiffs' briefing, I gathered that Plaintiffs took issue with a phrase in the article that the Augmenta implant had become "commercially available."

33. To be clear, Augmenta is not commercially available. That is an error. At this time, Augmenta has not received FDA clearance for sale or use. As explained elsewhere in the article, Augmenta is still "*awaiting* FDA 510k clearance." Any doctor or medical professional, which comprise generally the audience of journal articles such as this one, would easily understand that a product which is "awaiting," but does not yet have, FDA clearance is not a "commercially available" product.

34. Upon noting this error, we have reached out to the editors of the journal to seek a correction of this erroneous phrase as follows:

> Here we evaluate the anatomic changes produced by implantation of the new Augmenta CPI through the use of anatomic cadaveric models

That correction has been made: https://www.smoa.jsexmed.org/article/S2050-1161(22)00001-0/fulltext#relatedArticles.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 15, 2022, at Houston, Texas.

_____
Robert J. Cornell, M.D.