O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL MEDICAL DEVICES, INC.; *et al.*,<br><br>Plaintiffs,<br>v.<br>ROBERT CORNELL, MD, an individual; *et al.*,<br><br>Defendants. | Case No.: 2:20-cv-03503-CBM (RAOx)<br><br>**ORDER RE: PLAINTIFFS' POST-TRIAL MOTION FOR AWARD OF REASONABLE ROYALTIES, DISGORGEMENT, STATUTORY DAMAGES, PREJUDGMENT INTEREST, AND EXEMPLARY DAMAGES.  (668)** |

The matter before the Court is Plaintiffs' Post-Trial Motion for Award of Reasonable Royalties, Disgorgement, Statutory Damages, Prejudgment Interest, and Exemplary Damages.  (Dkt. No. 668 (the "Motion").)  The Motion is fully briefed. (Dkt. Nos. 772, 777.)

**I.     BACKGROUND**

**A.     The Complaint**

On April 15, 2020, Plaintiffs International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova") and James Elist, MD ("Dr. Elist") (collectively, "Plaintiffs") brought this suit against Defendants Robert Cornell, MD ("Dr. Cornell"); Robert J. Cornell M.D., P.A.; Augmenta, LLC; AM Founders, LLC; Augmenta Investors, LLC; Jonathan Clavell Hernandez, MD;

1

Clavell Urology, LLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Capital Urology Associates, LLC; Richard B. Finger; and LATA Lignum LLC (collectively the "Defendants"). (Dkt. No. 1.) The First Amended Complaint ("FAC") asserts the following claims: (1) Misappropriation of Trade Secrets under Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq. (against all Defendants); (2) Misappropriation of Trade Secrets under Cal. Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426 et seq. (against all Defendants); (3) RICO under 18 U.S.C. § 1962(c) (against all Defendants); (4) RICO under 18 U.S.C. § 1962(d) (against all Defendants); (5) Trademark Infringement under 15 U.S.C. §§ 114, 1125(a) (against. Dr. Cornell, the Cornell PA, Dr. Clavell, and the Clavell PA); (6) Counterfeit Mark under 15 U.S.C. § 1117 (against Dr. Cornell, the Cornell PA, Dr. Clavell, and the Clavell PA); (7) Copyright Infringement under 17 U.S.C. § 501 (against Drs. Cornell, Mische, and Nichols); (8) Breach of Contract (against Dr. Cornell and Dr. Wang); (9) Breach of Contract (against Dr. Wang); (10); Breach of Covenant of Good Faith and Fair Dealing (against Dr. Cornell and Dr. Wang); (11) Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (against all Defendants); (12) Declaratory Relief (against all Defendants); (13) False Advertising under 15 U.S.C. § 1125(a) (against Dr. Cornell and Augmenta, LLC). (Dkt. No. 96.)

**B.     The Preliminary Injunction**

On January 1, 2021, the Court issued a preliminary injunction precluding Defendants from (1) using or disclosing Plaintiffs' trade secret information; (2) commercializing, marketing, advertising, promoting, offering for sale, and/or profiting from the Augmenta implant, U.S. Patent No. 10413413 ("'413 Patent"), and Patent Application No. 16/238,821 ("'821 Application"); (3) referencing, mentioning, promoting, advertising, marketing and/or using the Penuma mark in

commerce; and (4) acting in a way likely to cause confusion, mistake, or deception on the part of consumers as to the origin or sponsorship of Penuma. (Dkt. No. 138.) The injunction remains in full force and effect. (*Id.*)

C. **Summary Judgment/Adjudication**

On September 14, 2021, Defendants filed a motion for summary judgment on all of Plaintiffs' claims. (Dkt. No. 253.) The Court granted Defendants' Motion as to Plaintiffs' Tenth Cause of Action for breach of the covenant of good faith and fair dealing and dismissed the claim. (Dkt. No. 527.) The Court also granted Defendants' Motion as to Plaintiffs' Eighth Cause of Action for breach of the nondisclosure agreement against Dr. Run Wang. The Court otherwise denied the Motion. (Dkt. No. 527 at 28.)

On September 14, 2021, Plaintiffs filed a motion for summary adjudication on their trademark (Fifth Cause of Action), counterfeit (Sixth Cause of Action), copyright (seventh cause of action), breach of contract (Eighth and Ninth Causes of Action), and good faith and fair dealing claims (Tenth Cause of Action). (Dkt. No. 254.) The Court granted Plaintiff's Motion as to the Seventh Cause of Action for copyright infringement and held that Plaintiffs are "entitled to damages and permanent injunctive relief" as to that cause of action. (Dkt. No. 528 at 19.) The Court also granted Plaintiffs' motion as to the Ninth Cause of Action for breach of the Consulting Services Agreement[1] against Dr. Wang.[2] (Dkt. 528 at 24-25.) The Court otherwise denied the Motion. (*Id.*)

D. **Damages**

Prior to trial, by stipulation, the parties agreed that the Court, not the jury,

---

[1] On October 6, 2017, Dr. Wang entered into a Consulting Services Agreement with IMD, and served on IMD's board of advisors until August 2020. In February 2020, Dr. Elist discovered that Dr. Wang was listed as a CEO of Augmenta on Augmenta's website. (Dkt. No. 528.)

[2] At trial, Plaintiffs elected to pursue nominal damages on this claim, which the jury awarded in the amount of $1. (Dkt. No. 649 at 7.)

3

would consider harm and the appropriate compensation of Plaintiffs related to trade secret liability and Dr. Cornell's breach of the non-disclosure agreement. (Dkt. No. 599.) Specifically, the Parties agreed that, as Plaintiffs were unable to prove or quantify damages with particularity as to these claims, the Court would consider a reasonable royalty award if the jury found liability on either of these claims. (*Id.* at 1-3.) The parties also agreed that the Court would determine trademark infringement damages, pursuant to *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015), which held that a disgorgement award is equitable.

### E. Trial and Jury Verdict

On June 16, 2023, this case proceeded to trial. The jury found in favor of Plaintiffs for: (1) misappropriation of four of Plaintiffs' trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), (2) infringement of Plaintiff Menova's registered trademark (the "Penuma Mark"), (3) use of a counterfeit Penuma Mark, (4) infringement of Plaintiffs' copyrighted video, and (5) breach of the Non-Disclosure Agreement ("NDA") by Dr. Cornell. (Dkt. No. 649.) The jury also found invalid, by clear and convincing evidence, two patents issued to certain Defendants. (*Id.*) The jury awarded Plaintiffs $1,650 for Defendants' copyright infringement of a Penuma informational video based on an invoice for the creation of the video. (*Id.* at 6, Trial Ex. 314.) The jury also awarded nominal damages for Dr. Wang's breach of the Consulting Services Agreement. (Dkt. No. 649.)

### F. Evidentiary Hearing

On October 25, 2023, the Court held an evidentiary hearing on Plaintiffs' Motion. (Dkt. No. 690.) During the evidentiary hearing, experts for both parties testified, exhibits were received into evidence, and Jonathan Elist testified regarding IMD's damages. (Dkt. No. 671.) Plaintiffs seek the following: (1) reasonable royalties in the amount of $14,668,744 for the Second Cause of Action

for trade secret misappropriation under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426 et seq. (plus exemplary damages up to two times the royalty award for willful and malicious misappropriation); (2) reasonable royalties in the amount of $14,668,744 for the Eighth Cause of Action for breach of contract against Dr. Cornell; (3) disgorgement of profits in the amount of $325,000 under the Fifth Cause of Action for trademark infringement, to be trebled, including prejudgment interest; and (4) $1,000,000 in statutory damages for offering services under a counterfeit mark pursuant to the Sixth Cause of Action. (Dkt. No. 668.)

## II. DISCUSSION

### A. Reasonable Royalty Award for Defendants' Violation of CUTSA and Dr. Cornell's Breach of the NDA

A reasonable royalty award under CUTSA is "a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret." *Ajaxo, Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1308 (2010). "When calculating a monetary remedy for the past use of a misappropriated trade secret, a court 'may order' reasonable royalties '[i]f neither damages [for actual loss] nor unjust enrichment caused by misappropriation are provable.'" *Id.* (quoting Cal. Civ. Code § 3426.3(b)) (alteration in original). Under CUTSA, the relevant time period for calculating a royalty award must be "no longer than the period of time the use [of the trade secret] could have been prohibited." Cal. Civ. Code § 3426.3(b); *see also Univ. Computing Co., v. Lykes-Youngstown Corp.,* 504 F.2d 518, 534 (5th Cir. 1974) ("Unlike a patent which is totally protected for the period of time for which it is granted, the protection afforded a trade secret is limited— for it is protected only so long as competitors fail to duplicate it by legitimate, independent research.").

A reasonable royalty should approximate "the price that would be set by a willing buyer and a willing seller for the use of the trade secret made by the

defendant." *Ajaxo, Inc.,* 48 Cal. App. 5th at 160 (quoting Rest.3d Unfair Competition (1995) § 45, com. G, p. 518.) The proper measure of the royalty, then, is "what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Ajaxo, Inc.*, 48 Cal. App. 5th at 161 (quoting *Univ. Computing Co.*, 504 F.2d at 539. Overall, the hypothetical negotiation inquiry "offers no promise of mathematical precision" but is instead meant to provide "flexibility [that] is consistent with the policies underlying trade secret protection." *Ajaxo, Inc.*, 48 Cal. App. 5th at 161-62. The hypothetical negotiation framework is commonly employed to assess reasonable royalty damages in intellectual property litigation, including matters involving the misappropriation of trade secrets. *Id*.

### 1. Mr. Arst's Expert Opinion

Plaintiff's expert, Kevin Arst, is a senior managing director of Ankura Consulting Group, Inc., which helps its clients including corporations, law firms, government entities, and investors – understand and evaluate financial aspects of intellectual property. (Declaration of Kevin Arst ("Arst Decl."), Dkt. No. 668-1, ¶ 3.)[3] Mr. Arst has been a consultant focused on financial issues pertaining to intellectual property since 1999. (*Id.* at ¶ 4.) Mr. Arst is also a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics ("CFF") by the American Institute of Certified Public Accountants ("AICPA"), and a Certified Licensing Professional ("CLP"). (*Id.* at ¶ 5.) Mr. Arst has been named one of the World's Leading IP Strategists by Intangible Asset Management and served as an Officer of the Licensing Executives Society United States & Canada ("LES"), one of the U.S.'s largest IP trade associations. (*Id.*) He is also a past Chair of the Valuation and Taxation Committee of the LES. (*Id.*)

---

[3] The Court admitted Mr. Arst's Declaration into evidence at the Evidentiary Hearing on October 25, 2023.

Mr. Arst applied a hypothetical negotiation framework to determine a reasonable royalty for licensing Plaintiffs' trade secrets. Mr. Arst set forth the following in structuring the hypothetical negotiation:

> IMD expected the trade secret and other confidential information that it provided to Cornell under the breached contract would remain confidential and would not be disclosed or used by Cornell and the other Defendants to raise capital and develop a competitive medical implant product. However, IMD's trade secret and confidential information was used to develop the competitive Augmenta implant and was used as the basis for Cornell's patent applications (which resulted in the issuance of two patents), which publicly disclosed Plaintiff IMD's trade secrets. An owner of intellectual property in IMD's position would reasonably expect a third party wishing to use that intellectual property to seek a license to do so, as is typical in matters involving technology transfer.

(Arst. Decl. at ¶ 43.)

Mr. Arst testified that the hypothetical negotiation framework generally assesses the amount that a willing licensor and a willing licensee would have agreed upon for a license of intellectual property. (*Id.*) He stated that parties to the hypothetical negotiation would have reasonably foreseen the risk that the hypothetical license would pose to IMD including licensing a competing business. (*Id.*)

To determine the appropriate reasonable royalty, Mr. Arst considered the following factors: (1) the date of, and parties to, the hypothetical negotiation; (2) the structure of the hypothetical license; (3) the factors set forth in *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974)[4] and their influence on the hypothetical negotiation; (4) the cost, market, and

---

[4] *University Computing Co. v. Lykes-Youngstown Corp.* set forth the following factors for calculating a fair licensing price (1) the resulting and foreseeable changes in the parties' competitive posture; (2) what prices past purchasers or licensees may have paid; (3) the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; and (5) finally whatever other unique factors in the particular case which might have affected the parties' agreement, such as the ready availability of alternative processes. 504 F.2d at 539.

income valuation methodologies; and (5) the bargaining strengths of the licensor and licensee. (*Id.*)

    Mr. Arst ultimately applied an Income Approach to calculate the reasonable royalty. (*Id.*) While he considered other accepted valuation methodologies including the Cost Approach and the Market Approach, he ultimately concluded that the evidence does not support using these methodologies. (*Id.*) The Income Approach is a method of determining net present value of anticipated future cash flow. Mr. Arst considered the following in applying the Income Approach: (1) Deendants' expectations of the revenues and profits for Augmenta; (2) Augmenta's anticipated revenues and profits that could be reasonably attributed to the misappropriated trade secrets; and (3) converting the revenues to a present value lump-sum royalty using an appropriate discount rate based on the risk involved in the project. (*Id.* at ¶ 110).

    To assess Dr. Cornell's expectations of Augmenta's revenues, Mr. Arst relied on a financial forecast detailing the first five years of the Augmenta implant's commercial launch prepared by Dr. Cornell and Mr. Richard Finger[5] in June 2018. (Arst. Decl. at ¶ 111; Trial Ex. 215.) The June 2018 forecast anticipated approximately $182 million in revenue in the first five years of Augmenta's commercial launch. (*Id.*) Mr. Arst considered additional financial forecasts for Augmenta circulated in October and December 2018 which projected similar revenue amounts. (Trial Ex. 6-41.) In October 2020, another forecast indicated approximately $347 million in revenue for Augmenta over a ten-year period. (Trial Ex. 76-046.)

    To assess a royalty rate that would capture the portion of the Augmenta implant's anticipated revenues and profits that could be reasonably attributed to

---

[5] Mr. Richard Finger is the owner of Lata Lingum, which holds an indirect interest in Augmenta LLC, and had a role in developing the financial forecasts included in the Confidential Offering Memoranda of Augmenta Investors LLC.

8

the misappropriated trade secrets, Mr. Arst considered two transactions. The first was a negotiation between IMD and Fort Washington Pharma in 2016 involving a license. (Trial Ex. 415.) Fort Washington Pharma was to make an upfront cash payment of $5 million and additional cash payments amounting to $25 million over the following four years. (*Id.*) Mr. Arst also considered the royalty rates and payments set forth in the document entitled "Penuma Term Sheet" to calculate a 30% royalty rate. (Arst. Decl. at ¶ 120.) The second transaction was between OAM LLC[6] and Augmenta LLC. (Trial Ex. 206-008-10.) OAM LLC received 15% of the membership units of Augmenta LLC in exchange for its contribution of "preliminary designs, provisional patent application, and any other intellectual property." (*Id.*; Arst Decl. at ¶ 118.) Based on the two transactions, Mr. Arst concluded that 20% of the Augmenta implant's anticipated sales and profits could be reasonably attributed to IMD's trade secrets which served as the basis for the design and anticipated market entry of the Augmenta implant. (*Id.*)

As for the duration of the license, Mr. Arst proposed a ten-year term based on Defendants' expected use of the licensed trade secrets. Mr. Arst also considered Augmenta's October 2020 ten-year forecast of sales, IMD's 2016 Penuma Term Sheet which specified royalty payments for more than ten years, and the 20-year legal life of Defendants' patents. (*Id.* at ¶114.) Mr. Arst applied the 20% royalty rate to Augmenta's June 2018 forecasted revenues which yielded a nominal royalty stream of $187.2 million over a ten-year period. (*Id.* at ¶ 131.) Mr. Arst converted the $187.2 million to a present value, lump-sum royalty by using a 35% discount rate,[7] which he determined to be an appropriate rate for a

---

[6] OAM LLC is a limited liability company formed by Dr. Cornell who is a 60 percent member and Mr. Mische who is a 40 percent member. It was responsible for developing designs and IP for Augmenta LLC and is a five percent member of Augmenta, LLC.

[7] Mr. Arst used a 35% discount rate based on guidance provided by "Valuation and Dealmaking of Technology Based Intellectual Property" which indicates a 35-

9

project like Augmenta due to its use of new technology. (*Id.* at ¶ 132.) Mr. Arst also applied a 1% risk factor to account for the risk that Augmenta would not get FDA approval. (*Id.* at ¶¶ 135-141.)

Mr. Arst prepared the chart below, entitled "Present Value of Royalties from Augmenta Revenues" which is attached to his declaration as Exhibit C. (Dkt. No. 668-4.) The chart provides a reasonable royalty calculation for years one through ten, after applying the 20% royalty rate and the discount factors. (*Id.*) Mr. Arst calculated a lump-sum, present value royalty of $14,668,744, after applying a $772,039 discount to remove the value of Plaintiffs' withdrawn trade secret related to antibacterial agents.[8] (*Id.* at ¶¶ 135-145.)

| | Year 1<br>Apr. 22, '20 -<br>Apr. 21, '21 | Year 2<br>Apr. 22, '21 -<br>Apr. 21, '22 | Year 3<br>Apr. 22, '22 -<br>Apr. 21, '23 | Year 4<br>Apr. 22, '23 -<br>Apr. 21, '24 | Year 5<br>Apr. 22, '24 -<br>Apr. 21, '25 | Year 6<br>Apr. 22, '25 -<br>Apr. 21, '26 | Year 7<br>Apr. 22, '26 -<br>Apr. 21, '27 | Year 8<br>Apr. 22, '27 -<br>Apr. 21, '28 | Year 9<br>Apr. 22, '28 -<br>Apr. 21, '29 | Year 10<br>Apr. 22, '29 -<br>Apr. 21, '30 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Augmenta Revenues (1) | $3,750,000 | $10,450,000 | $18,500,000 | $45,600,000 | $103,750,000 | $129,111,111 | $142,944,444 | $154,472,222 | $161,388,889 | $166,000,000 | $935,966,667 |
| Revenue Growth Rate in Years 6-10 (2) | N/A | N/A | N/A | N/A | N/A | 24.4% | 10.7% | 8.1% | 4.5% | 2.9% | |
| Effective Royalty Rate | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | N/A |
| Royalties | $750,000 | $2,090,000 | $3,700,000 | $9,120,000 | $20,750,000 | $25,822,222 | $28,588,889 | $30,894,444 | $32,277,778 | $33,200,000 | $187,193,333 |
| Discount Factors (3) | 0.4628 | 0.3428 | 0.2540 | 0.1881 | 0.1393 | 0.1032 | 0.0765 | 0.0566 | 0.0420 | 0.0311 | N/A |
| PV of Royalties from Augmenta Revenues | $347,119 | $716,522 | $939,618 | $1,715,579 | $2,891,347 | $2,665,274 | $2,185,807 | $1,749,690 | $1,354,100 | $1,031,695 | $15,596,751 |
| Regulatory Risk Adjustment (5) | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | N/A |
| Adjusted PV of Royalties | $343,648 | $709,357 | $930,222 | $1,698,423 | $2,862,433 | $2,638,622 | $2,163,949 | $1,732,193 | $1,340,559 | $1,021,378 | $15,440,783 |
| | | | | | | | | | | Less: Value of Antibacterial Agents (5) | ($772,039) |
| | | | | | | | | | | Total Reasonable Royalty Damages | $14,668,744 |

### 2. Dr. Hatch's Expert Opinion

Defendants' expert, Dr. John Hatch works for Applied Economics Consulting Group. which conducts economic and financial analysis for clients across several industries. (Trial Tr. 174:10-11.) Dr. Hatch works on valuation related to civil litigation damages, including valuations of intellectual property.

---

40% discount rate for "very high risk, such as making a new product with new technology to a new segment." (*Id.* at ¶ 130).

[8] Plaintiffs withdrew their allegation that Defendants misappropriated the concept of using antibacterial or anti-microbial coating in a cosmetic penile implant. (Dkt. No. 249.) Thus, the Court issued an Order precluding Mr. Arst from opining on damages for concepts that are not alleged as misappropriated trade secrets in this case. (Dkt. No. 539.)

10

(*Id.* at 174:13-17.) He has been involved in eighteen publications pertaining to valuation topics, including valuing businesses, minority interests, intangible assets, and intellectual property. (*Id.* at 174:21-175:1.)

Dr. Hatch opined that Mr. Arst's reasonable royalty suffers from the following flaws: (1) use of a ten-year royalty term; (2) application of the income approach; (3) use of Augmenta's "speculative" forecast; and (4) use of an over-inflated royalty rate calculation. (Trial Tr. 223:23-224:3.) Dr. Hatch opined that ten-years is greater than the period of time during which IMD could have prohibited Dr. Cornell from using the trade secrets, because it exceeds the period of the NDA. (*Id.*) He further opined that during the hypothetical negotiation, the licensor would not require the licensee to pay a royalty to use trade secrets that would expire after an NDA. (*Id.* at 179:9-13.)

Dr. Hatch criticized Mr. Arst's use of the income approach on the basis that there have been no sales of the Augmenta to date due to the preliminary injunction entered in this case. (Trial Tr. 175:21-25.) Since there has been no revenue to which one could apply a royalty rate, Dr. Hatch opined the income approach yields a royalty of zero. (*Id.* at 177:7-12.) Dr. Hatch further criticized Mr. Arst's use of Augmenta's "speculative" forecast because it did not exist at the time of the hypothetical negotiation. He opined that the correct method is to use actual results to replace forecasts or assumptions that were present at the time of the hypothetical negotiation, and under the circumstances presented here, the results would be zero since there have been no sales of Augmenta. (*Id.* at 182:15-19.) Dr. Hatch testified that during the hypothetical negotiation, the parties would have used IMD's operating margin as informative of the royalty agreement. (*Id.* at 184:2-185:12.) He stated that Mr. Arst over inflated the royalty rate calculation by focusing on the unrealized operating margin in Augmenta's forecast. (*Id.* at 187:21-188:1.) He also criticized Mr. Arst's consideration of the Penuma Term Sheet in calculating the royalty rate because the terms of that license were not

agreed upon. (*Id.* at 189:16-190:5.)

Dr. Hatch used the Market Approach to propose a reasonably royalty model based on the following: (1) OAM LLC's transfer of all intellectual property related to the Augmenta design to Augmenta LLC "in exchange for 15% of the membership units" in Augmenta, LLC (Trial Ex. 206); and (2) Lata Lingum's[9] $300,000 contribution to Augmenta LLC in exchange for an indirect 37.4% ownership interest. (Trial Tr. 201:12-203:13.) Based on these two "arm's length" transactions, Dr. Hatch calculated the value of OAM LLC's 15% equity interest in Augmenta LLC to be $136,405. (Trial Tr. 204:23-24.) Dr. Hatch opined that the value of the trade secrets is 60% of OAM's total interest of $136,405, which is $81,843. (*Id.* at 206:21-25.) Dr. Hatch alternatively calculated a lump-sum royalty rate using a running royalty rate of 4.5% for a five-year term, based on IMD's operating margin in 2017. (*Id.* at ¶ 231:10-233:18.) Using the same discount rate and parameters as Mr. Arst, Dr. Hatch proposed a lump-sum royalty of approximately $180,000. (*Id.* at ¶ 217:19-22.)

### 3. The Court's Findings re Reasonable Royalty

It is undisputed that IMD and Defendants are direct competitors of cosmetic penile implants. In October 2018, Defendants prepared and circulated a Confidential Offering Memorandum from Augmenta Investors LLC which informed prospective investors that "the success of our business will depend, in significant part, on . . . preserving our trade secrets." (Trial Ex. 6-020.) The nature and extent of Defendants' use of IMD's trade secrets weighs in favor of a reasonable royalty higher than that proposed by Dr. Hatch. The genesis of the Augmenta Implant was the March 30, 2018 training Dr. Cornell attended with Dr. Elist where he observed Dr. Elist perform four Penuma implant procedures. (Jury

---

[9] AM Founders LLC held the remaining 85% ownership interest in Augmenta LLC. Richard Finger owned Lata Lignum LLC which partly owned AM Founders LLC.

Trial Tr. 1190:21-1191:8.) Dr. Cornell used the trade secrets as a basis for the provisional patent application he filed less than four month later. (Trial Exs. 29, 78.)

The period of time during which the use of the trade secrets could have been prohibited is five years based on the duration of the NDA Dr. Cornell signed on March 30, 2018. (Trial Ex. 14.) Therefore, Plaintiffs are entitled to a royalty award that is limited to a five-year period. The Court calculates the reasonable royalty rate based on Mr. Arst's calculations, after applying the 20% royalty rate and the discount factors as set forth in Exhibit C to his declaration. (Dkt. No. 668-4.) The sum of years one through five is $6,544,083. The Court subtracts $772,039 to account for the withdrawn trade secret related to antibacterial agents. Thus, the Court awards Plaintiffs a reasonable royalty of $5,772,044.

### B. Exemplary Damages

"If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice" the amount of the reasonable royalty. Cal. Civ. Code § 3426.3(c). Plaintiffs seek exemplary damages on the basis that Defendants' trade secret misappropriation was "willful and malicious." Malice may be proven either expressly by direct evidence probative of the existence of ill-will, or by implication from indirect evidence. *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 923 n.6 (1978); *Ajaxo Inc.*, 135 Cal. App. 4th at 66-67.

To support an award for exemplary damages, Plaintiffs cite to Dr. Cornell's April 23, 2018 email to Mr. Mische asking if there was anything in the NDA requiring that Cornell stay "under the radar on the patent, etc." (Jury Trial Tr. 1254:1-25; Trial Ex. 17.) Plaintiffs contend that this email reveals Dr. Cornell's state of mind that "he needed to go undetected because he was violating the law." Moreover, while raising funds to commercialize Augmenta, Augmenta Investors LLC included the following in its Offering Memorandum: "Dr Elist may threaten

13

or commence litigation relating to intellectual property rights." (Jury Trial Tr. 1061:20-1065:2; Trial Ex. 6, 206.) Plaintiffs also contend that Dr. Cornell "raced to the USPTO to apply for a patent based on some of the misappropriated trade secrets."

Dr. Cornell attended the training with Dr. Elist on March 30, 2018, and signed the NDA that same day. (Trial Ex. 14.) Within days, Dr. Cornell began working on a provision patent application for a cosmetic penile implant, which was filed on July 23, 2018—less than four month later after the training with Dr. Elist. (Trial Ex. 17.) The Court finds the conduct in which the Defendants engaged amounted to a willful and malicious misappropriation. *See Mattel, Inc. v. MGA Entm't, Inc.,* 801 F. Supp. 2d 950, 954-55 (C.D. Cal. 2011) (granting $85 million exemplary damages award based on counter-defendant toy company's "nefarious tactics," which included using "false pretenses to access competitors' private" information and using stolen "trade secret information to preempt [counter-claimant's] unreleased products[.]"). Accordingly, the Court awards exemplary damages of $11,544,088—twice the reasonable royalty award.

## C. Disgorgement for Trademark Infringement

Under the remedies provision of the Lanham Act, a court may award (1) the defendant's profits, (2) the damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). "[D]isgorgement of profits is a traditional trademark remedy." *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004-05 (9th Cir. 2004) (describing the remedy in enforcement of trademark injunction cases, as "akin to an award of the infringer's profits under trademark law"). Disgorgement of profits "is intended to award profits only on sales that are attributable to the infringing conduct." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).

Plaintiffs request that the Court order disgorgement of the $325,000 Dr. Cornell received for "design and development" of Augmenta, which included

14

"development, regulatory clearance and marketing of the Product." (Trial Ex. 206.) In support of this, Plaintiffs contend that Dr. Cornell's "'marketing' consisted of brazenly using the name and goodwill of a competitor to confuse and steal patients and help entice investors." However, the $325,000 received for "design and development" does not amount to profits that are subject to disgorgement. *See Grasshopper House, LLC v. Clean & Sober Media, LLC,* 2021 WL 3702243, at *2 (9th Cir. Aug. 20, 2021) ("Disgorgement is limited to 'the financial benefit [defendant] received because of the advertising.'") (quoting *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986).) Accordingly, the Court **DENIES** Plaintiffs' Motion for disgorgement of $325,000.

**D.     Statutory Damages for Use of a Counterfeit Mark**

The jury found that Defendants Cornell and Cornell PA infringed upon and counterfeited the registered Penuma Mark. As a result, Plaintiffs seek statutory damages in the amount of $1 million. In counterfeit mark cases, a plaintiff may elect an award of statutory damages for "any such use in connection with the sale [or] offering for sale. . . of goods or serves." 15 U.S.C. § 1117(c). District courts have discretion in determining statutory damages, subject to the statutory minimum ($1,000) and maximum ($200,000). 15 U.S.C. § 1117(c)(1). A finding of willfulness subjects a defendant to an enhanced statutory maximum of $2,000,000. 15 U.S.C. § 1117(c)(2).

Dr. Cornell advertised himself as a "Penuma penile enhancement specialist" on his website and used the registered Penuma Mark, even though he knew he was not an authorized Penuma specialist. (Trial Ex. 24.) Dr. Cornell continued to use the Penuma trademark even after receiving two cease and desist letters from Jonathan Elist. (Trial Exs. 25, 511.) Dr. Cornell also created a "waiting list" with patient contact information for use once the Augmenta Implant was FDA approved. (Trial Ex. 531.) Plaintiffs compiled a list of calls and website inquires to Dr. Elist asking about Dr. Cornell' availability for surgery, mentioning similar

procedures offered by Dr. Cornell, and inquiring whether Dr. Cornell offered the same procedure as Penuma. (Trial Ex. 94A.) This is evidence that Dr. Cornell's use of the Penuma mark caused confusion among patients who thought Dr. Cornell offered the Penuma implant and may have caused lost opportunities for Plaintiffs. (*Id.*, Jury Trial Tr. 1792:6-17.) Dr. Cornell knew he was not authorized to use the Penuma mark or offer services related to Penuma. Thus, the Court awards Plaintiffs $1 million in statutory damages for Defendants' use of the counterfeit mark.

### III. CONCLUSION

Accordingly, the Court **GRANTS in part** Plaintiffs' Motion as follows:

- for the CUTSA violation and Dr. Cornell's breach of the NDA, a reasonable royalty in the amount of $5,772,044, plus exemplary damages in the amount of $11,544,088;[10]
- for the use of a counterfeit mark claim, statutory damages in the amount of $1,000,000.

The Court **DENIES in part** Plaintiffs' Motion for disgorgement of $325,000. Plaintiffs are ordered to prepare a proposed judgment consistent with this Order and the Order re Motion for Permanent Injunction, and file the same with the Court no later than April 30, 2024.

**IT IS SO ORDERED.**

DATED: March 28, 2024.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[10] To the extent the parties disagree with the Court's calculation of the reasonable royalty, the parties shall request a hearing **no later than April 5, 2024**. The Court is available for a hearing to and including **April 23, 2024**. If there is no need for a hearing, the parties shall file a stipulation **no later than April 5, 2024** advising the Court that no hearing is necessary.