O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| International Medical Devices, et al, <br><br>    Plaintiffs, <br> v. <br> Robert Cornell, MD, an individual, et al, <br><br>    Defendants. | Case No.: 2:20-cv-03503-CBM (RAOx) <br><br> **ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL** |

The matter before the Court is Renewed Motion for Judgment as a Matter of Law and Motion for New Trial. (Dkt. No. 716 ("Motion").)

## I.   BACKGROUND

This is a trade secrets case filed by Plaintiffs International Medical Devices, Inc., Menova International, Inc., and James Elist, MD against multiple Defendants.[1] (Dkt. No. 578.) The parties are familiar with the factual and procedural background of the case; therefore, the Court does not repeat the relevant facts herein. On June

---

[1] Defendants are Robert Cornell, MD; Augmenta, LLC; Robert J. Cornell M.D., P.A.; Jonathan Clavell Hernandez, MD; Clavell Urology, PLLC; OAM LLC; Cornell Cosmetic Urology, LLC; David Louis Nichols; Huck Medical Technologies, Inc.; Hans Mische; Hans Mische, LLC; Run Wang, MD; RW Global Men's Health Consulting Services, PLLC; Richard B. Finger; and Lata Lignum LLC. (Dkt. No. 578 at 4.)

13, 2024, Defendants filed the instant Motion, and on June 24, 2024, Defendants filed an amended version of the Motion. (Dkt. Nos. 713, 716.)

## II. STATEMENT OF THE LAW

Federal Rule of Civil Procedure Rule 50(b) states that "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." "A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id*. (internal quotations omitted). Relief is proper if "a party has been fully heard on an issue, and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves*, 530 U.S. at 149. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. at 150. And "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151.

Rule 59(a) states, "[a] new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Rule 59 authorizes the district courts to grant a motion for new trial "on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Ninth Circuit has applied Rule 59 to permit a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal citation omitted).

## III. DISCUSSION

**A. Trade Secret Misappropriation**

*1. Secrecy*

The CUTSA defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "The secrecy requirement is generally treated as a relative concept and requires a fact-intensive analysis." *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). "[T]he value of a trade secret arises from its secrecy and the ability to control whether, how and to whom it is disclosed," not from their novelty. *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 452111, at *3 (N.D. Cal. Jan. 17, 2018) (citing *Bunner*).

Defendants contend that Plaintiffs failed to introduce sufficient evidence that the alleged four trade secrets were secret, that they derived "independent economic value from secrecy," and that Plaintiffs "used reasonable efforts to maintain its secrecy." (Mot. at 7.)

a) <u>Not generally known</u>

The four trade secrets at issue here are: (1) the incorporation of internal pockets or voids of space within the silicone body of a cosmetic penile silicone implant to add softness and elasticity; (2) the incorporation of mesh tabs embedded in or around the distal tip of a cosmetic penile implant to facilitate tissue ingrowth; (3) the use of absorbable sutures as part of the cosmetic silicone penile implant procedure paired or in combination with mesh tabs embedded in and around the distal tip of the implant to hold the implant; and (4) a particular list of instruments and materials used to perform the surgical method associated with the placement of

a cosmetic penile implant referred to as the Penuma Instrument and Supply List. Plaintiffs introduced evidence that each of the four trade secrets was not generally known in 2018.[2]

    b)  <u>Reasonable steps to protect trade secrets</u>

"'Reasonable efforts' can include advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995) (citations omitted). In *Religious Tech*, the district court found reasonable steps were taken, including "use of locked cabinets, safes, logging and identification of the materials, availability of the materials at only a handful of sites worldwide . . . and confidentiality agreements for all of those given access to the materials." *Id*. at 1254. Plaintiffs introduced evidence at trial of the reasonable steps they took to protect their trade secrets.[3]

---

[2] (*See* Trial Tr. at 1182:18-1183:1, 1184:7-10, 820:17-822:24, 1591:3-1592:17, 1596:8-1597:12, 1658:15-24, 1660:1-1661:22 (testimony showing that internal pockets/voids within implant was not generally known); *id*. at 1591:10-25, 1415:14-1418:3, 1419:9-1420:17, 1651:18-1652:7, 1653:5-1655-4, 1657:11-1658:1, 1671:7-1673:14, 1673:15-1674:19, 1655:24-1657:10 (testimony showing that mesh tabs around distal tip of implant was not generally known); *id*. at 1555:9-15, 1419:9-1420:17 (testimony that mesh tabs around distal tip in combination with absorbable sutures was not generally known); *id*. at 1678:3-1679:18, 1709:13-16 (testimony that the Penuma instrument and supply list was not generally known).

[3] (*See* Trial Tr. at 1780:21-1783:21 (testimony from Jonathan Elist describing steps Plaintiffs took to keep information confidential); *id*. at 1778:11-17, 1784:20-1785:5 (testimony regarding why IMD requires visiting surgeons sign an NDA and how IMD conducts its trade secret audits to make sure all measures to protect trade secrets "are in use and that they continue to be effective measures"); Ex. 86 (image of cabinet labeled "CONFIDENTIAL AND SENSITIVE, AUTHORIZED IMD PERSONNEL ONLY").

c) <u>Independent economic value</u>

"To have independent economic value, a trade secret must be 'sufficiently valuable and secret to afford an actual or potential economic advantage over others.'" *Calendar Rsch. LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007). "Independent economic value can be shown by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Id*. Moreover, "information can have independent economic value even if there is no actual product on the market utilizing the information. *Id*. "The standard to show that trade secrets derive economic value is not a high standard." *Id*. Plaintiffs introduced evidence establishing the trade secrets had economic value.[4] *See Calendar Rsch.*, 2017 WL 10378336 at *4 (noting that creation and development of products "would be less profitable without the expedited and simplified development processes inherent in these trade secrets").

Accordingly, there was evidence supporting that the four trade secrets were indeed secret, and judgment as a matter of law on this basis is not warranted. Similarly, Defendants have not identified evidence[5] that shows the clear weight of all the evidence was contrary to the jury verdict. Thus, a new trial is not warranted

---

[4] (*See* Trial Tr. at 1787:18-22, 1792:18-1794:13 (testimony from Jonathan Elist regarding value of trade secrets); *id*. at 1677:2-1678:2 (expert testimony that instrument list was valuable); *id*. at 1778:11-17, 1780:21-1783:21, 1784:20-1785:5, Ex 436 (testimony and exhibit describing steps taken to protect trade secrets); *id*. at 1075:1-21, Ex. 76 (Offering Memorandum for Augmenta Investors LLC indicating value of Augmenta product); *id*. at 1271:12-1279:23, Exs. 29 ('413 Patent), 78 ('639 Patent) (testimony and exhibits regarding the two patents Cornell obtained using the trade secrets).

[5] (*See* Trial Tr. at 334:21-335:4, 414:25-415:2 (evidence merely showing that general use of mesh for ingrowth and voids/internal pockets in a medical device is not a trade secret, not that Plaintiffs' contemplated use of those items in a penile implant was not a trade secret); 334:7-9, 1704:21-22 (evidence only indicates that the trade secret alleged is not the absorbable sutures itself).)

on this basis either.

    2.    *Each Defendant's Misappropriation*

Defendants contend that Plaintiffs "failed to introduce evidence" establishing "that each Defendant, individually, misappropriated any of [Plaintiffs'] four alleged trade secrets" because there was no evidence that each Defendant acquired the trade secrets "by improper means," no evidence that any Defendant other than Cornell "acquired knowledge of a trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use," and no evidence that any Defendants other than Cornell "used or disclosed any trade secret with knowledge that it was derived from or through a person who owed a duty to Plaintiff[s] to maintain its secrecy or limit its use." (Mot. at 12–16.)

The CUTSA defines "misappropriation" to mean:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>     (A) Used improper means to acquire knowledge of the trade secret; or
>     (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>         (i) Derived from or through a person who had utilized improper means to acquire it;
>         (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>         (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>     (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code 3426.1(b). The CUTSA also states that "improper means":

> "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone

shall not be considered improper means."

Cal. Civ. Code 3426.1(a).

### a) Cornell

The evidence at trial demonstrated that Cornell acquired the trade secrets when he attended the Penuma training session, that the NDA gave rise to a duty to maintain the secrecy of the information, that Cornell knew the NDA required him to maintain secrecy, and that he used those trade secrets in developing Augmenta.[6] This is sufficient to establish misappropriation as to Cornell. *See BladeRoom*, 2018 WL 452111 at *4 ("The court reiterates that a violation of CUTSA may occur when trade secrets are disclosed in violation of a contractual duty to maintain confidentiality").[7] Second, the CUTSA explicitly lists breach of a duty to maintain secrecy as "improper means." Even if Cornell did not use his breach of the NDA to *acquire* the information, signing the NDA to acquire the trade secrets only to breach the NDA later can also constitute "improper means." There was circumstantial evidence indicating that when Cornell signed the NDA, he did not intend to keep the trade secrets confidential, but instead was there to learn information he could use to develop a competing implant product.[8] Therefore, there was evidence supporting Cornell's liability under either section 3426.1(b)(2)(A) or 3426.1(b)(2)(B)(ii), and judgment as a matter of law is not warranted. Nor is a new

---

[6] *See* Exs. 29, 78 (trade secrets incorporated into '413 and '639 patents).

[7] It is unclear why Defendants argue that Plaintiffs must show the Defendants each acquired the trade secrets by "improper means" when the statute provides for multiple ways of misappropriation, some referencing "improper means" and some not. Note, however, that in the Final Pretrial Conference Order, the parties agreed that one of the elements necessary to establish a trade secret claim is "Defendants acquired, used, or disclosed Plaintiffs' trade secrets through improper means." The parties adopted this language from CACI 4401. (Dkt. No. 578 at 12.)

[8] *See* Exs. 20 (document incorporating trade secrets into a plan for developing Augmenta weeks after signing NDA); 212 (email from Cornell to Mische asking if the NDA required Cornell to stay "under the radar on the patent"); 1605:2-1607:14 (testimony regarding Cornell's questions and behavior during Penuma training).

7

trial warranted, as the clear weight of the evidence is not contrary to the jury verdict as to Cornell's misappropriation. (*See* Dkt. No. 649.)

        a)    Other defendants

Plaintiffs argue that the other Defendants "induced Cornell to breach the NDA and thus themselves acquired the trade secrets by improper means." (Opp. at 17.) This argument is tenuous. "To induce means to 'bring on or about, to affect, cause, to influence to an actor or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on.'" *In re Qualcomm Litig.*, 2019 WL 13159816, at *9 (S.D. Cal. Mar. 14, 2019) (quoting Black's Law Dictionary 775 (6th ed. 1990)). None of the evidence cited by Plaintiffs reflects that these Defendants took any actions to "bring . . . about," cause, influence, or incite Cornell to share the trade secrets he learned from the training. However, there *was* evidence to support that these Defendants knew or had reason to know that some of the trade secrets were "[d]erived from or through a person who had utilized improper means to acquire it" or "derived from . . . a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." Cal. Civ. Code § 3426.1(b)(2)(B)(i) & (iii).

First, the evidence showed that Defendants Mische and Nichols (and by extension, HMT) knew Cornell signed an NDA with IMD in connection with the Penuma training session.[9] This evidence also showed that Cornell shared certain of the trade secrets with these Defendants to develop a competing product to Penuma.[10] Thus, there was evidence supporting that Mische and Nichols (and HMT) had reason to know that these trade secrets were derived from a person (Cornell) who

---

[9] (*See* Trial Tr. at 972:13-974:22, 979:10-984:8 (testimony that Mische knew about the NDA); 1097:6-15 (testimony that Nichols knew about the NDA).)

[10] (*See* Trial Tr. at 984:4-986:16, 972:13- 974:22, Exs. 20, 213, 308 (testimony and exhibits showing Cornell shared trade secrets with Mische); 1100:2-25, 1113:3-1114:10, 1105:12-1107:11, Exs. 119, 123 (testimony and exhibits showing Cornell shared trade secrets with Nichols and HMT); Exs. 29, 78 (the '413 and '639 patents incorporating internal pockets, mesh tabs, and mesh tabs with absorbable sutures ideas and listing Cornell, Mische, and Nichols as inventors).)

8

owed a duty to Plaintiffs to maintain the secrecy of those ideas—Mische as to the mesh tabs, mesh tabs with absorbable sutures, and instrument list, and Nichols and HMT as to the internal pockets, mesh tabs, and mesh tabs with absorbable sutures.

Defendants argue that the jury "could not reasonably infer that any of the Defendants knew or had reason to know" that the information Cornell shared was in violation of the NDA from the evidence Plaintiffs cited. (Reply at 5.) But "[b]ecause direct evidence of misappropriation and misuse is not always available, plaintiffs can rely on circumstantial evidence to prove their case. [citation]. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Wisk Aero LLC v. Archer Aviation Inc.*, at *14 (N.D. Cal. June 9, 2023) (internal quotations and citation omitted). As for "disclosure or use" of the trade secrets, there was evidence that Defendants Mische and Nichols used the trade secrets in designing and developing Augmenta and by filing patents that incorporated the trade secrets.[11]

Second, there was evidence to support a reasonable inference that Finger had reason to know aspects of the Augmenta were derived from a person who owed a duty to Plaintiffs to maintain trade secrets.[12] Finger was aware Cornell attended the Penuma training and that Cornell built off what he learned at the training to develop the Augmenta. Evidence also showed that Finger was involved in the development of the implant with HMT. The Offering Memorandum, in which Finger was involved as CFO, showed that Augmenta Investors LLC was aware of the risk of litigation over the trade secrets at issue. A reasonable jury could conclude that (1) Finger was so involved in Augmenta that he would have been familiar with its

---

[11] (*See* Trial Tr. at 1088:1-10 (HMT hired to help develop Augmenta implant); Exs. 20, 29, 78, 119.)

[12] (*See* Trial Tr. at 1048:7-1049:1, 1097:6-15, 1044:22-1045:8; Exs. 206, 261, 324.)

9

product specifications, including the trade secrets, and (2) Finger knew Cornell observed the Penuma procedure under an NDA and anticipated Elist might sue for trade secret misappropriation, yet proceeded with developing Augmenta with Cornell anyway.[13]

Third, there was evidence to support a reasonable inference that Wang had reason to know aspects of the Augmenta were derived from a person (Cornell) who owed a duty to maintain the secrecy of those ideas. The evidence established that Wang "was a member of IMD's advisory board" and had himself signed an NDA with Plaintiffs.[14] Wang also assisted Cornell in performing two cadaver surgeries testing prototypes of Augmenta that incorporated the trade secrets.[15] Based on this evidence, a reasonable jury could conclude that, having signed an IMD NDA himself, Wang had reason to know during the cadaver surgeries that Cornell was utilizing the same trade secrets in the Augmenta that belonged to IMD.

Accordingly, judgment as a matter of law is not warranted on the basis that there was no evidence of each Defendant's misappropriation. As for a new trial, Defendants have not shown that the clear weight of the evidence is contrary to the jury verdict. (*See* Dkt. No. 649.)

3. Harm

Defendants contend that "IMD introduced no evidence" showing that the misappropriation "harmed Plaintiffs or caused Defendants to be unjustly enriched." (Mot. at 21.) Defendants cite to nothing in support of this argument. Jonathan Elist

---

[13] Defendants' argument that Finger could not have acquired the trade secrets because the technical information would be "incomprehensible" to him is unavailing. "Liability under CUTSA is not dependent on the defendant's 'comprehension' of the trade secret"—rather, it requires only "knowledge" of the secret. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 229 (2010), *as modified on denial of reh'g* (May 27, 2010), *disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 210, 229 (2011).

[14] (*See* Trial Tr. at 885:10-888:4; Ex. 339.)

[15] (*See* Trial Tr. at 883:1-884:12, 924:1-6, 925:14-926:4.)

1 testified that Cornell's breach of the NDA "put our confidential concepts out into
2 the world" such that "they're not protected anymore" and "the value is just
3 destroyed," and that in addition, the concepts are "now in a patent precluding us
4 from using our own ideas." (Trial Tr. at 1792:18-24.) Elist also testified that
5 because of Defendants' "use, unauthorized misappropriation of the plaintiffs' trade
6 secret concepts, and the instrument list," Plaintiffs have been "extremely harmed"
7 because they "lost something that was in development based on [Dr. Elist's]
8 experience" and that "there is no ability to commercialize it at this point and have
9 any modicum of protection around it." (Trial Tr. at 1793:5-14.) Elist elaborated
10 that the trade secrets, use of the Penuma mark "to syphon off patients," use of
11 Plaintiffs' "copyright image to get a patent," "complete disregard" for the NDA,
12 and the "idea of pretending to be one of our customers," particularly "just as we
13 were starting to get going as a company," were instances of harm to Plaintiffs. (*Id.*
14 at 1793:14-22.) Thus, judgment as a matter of law on the basis that there was no
15 evidence of harm is not warranted. Nor is a new trial warranted, as Defendants have
16 not shown that the clear weight of the evidence is contrary to the jury verdict.

17 \*          \*          \*

18 Accordingly, the Court denies the Motion as to the misappropriation claims.

19 **B.    Trademark Infringement**

20 Defendants argue that Cornell and his medical practice (the "Cornell
21 Defendants") are entitled to judgment as a matter of law or a new trial on the
22 trademark infringement claim because Plaintiffs "offered no evidence of damages
23 caused by" the Cornell Defendants' "use of the Penuma mark or evidence of profits
24 attributable to their use of the Penuma mark." (Mot. at 22.) That no damages
25 stemmed from the infringement does not mean that no harm was suffered. Jonathan
26 Elist's testimony at trial indicated that Plaintiffs suffered harm.[16] On this basis, the

---

[16] (*See* Trial Tr. at 1792:6-17 (in response to the question of how IMD has been harmed by the Cornell Defendants' unauthorized use of the Penuma mark, Jonathan

11

Court entered a permanent injunction with respect to the Penuma trademark. (Dkt. No. 700 at 3.)

Defendants also argue that Menova did not introduce sufficient evidence as to likelihood of customer confusion, a factor in the *Sleekcraft* test for trademark infringement. (Mot. at 22–24.) The trial record reflects there was actual confusion due to the trademark.[17] As for Defendants' request for a new trial, Defendants cite to no evidence indicating the jury's finding was clearly wrong. Accordingly, the Court denies the Motion as to the trademark infringement claim.

### C. Counterfeit Mark

Defendants contend that the Cornell Defendants are entitled to judgment as a matter of law or a new trial on the counterfeit claim because Menova failed to "establish evidence" that the mark used was a counterfeit mark, that the Cornell Defendants knew the mark used was counterfeit, or that the use of the mark was likely to confuse or deceive. (Mot. at 25–26.) Defendants also argue that Plaintiffs fail to show use of the mark "in connection with the sale, offering for sale, or distribution of goods." (Reply at 10.)

Evidence in the record demonstrated that the mark was counterfeit and Cornell knew the mark was counterfeit (Cornell was not authorized to provide Penuma, which he knew, and he used the mark "in anticipation of being credentialed to provide" the implant), and that the use was likely to confuse (patients contacted Plaintiffs and were under the impression Penuma was offered at Cornell's clinic).[18]

---

Elist testified that "[i]t caused a lot of confusion in the marketplace" at a time "when [Plaintiffs were] just starting to establish [themselves]" and "represented lost opportunities with patients.").)

[17] (*See* Trial Tr. at 1792:6-17; Ex. 94A (document logging inquiries received regarding Cornell offering the Penuma procedure and implant).)

[18] (*See* Trial Tr. at 1192:13-1195:16 (testimony by Cornell indicating the website for Robert J. Cornell, M.D., PA displayed the Penuma mark, confirming that Cornell didn't provide the Penuma surgery at the time the website displayed the mark, and confirming Cornell was not authorized to provide Penuma and that the

Contrary to Defendants' contentions, the evidence indicated that Cornell and his medical practice did "offer for sale" the Penuma implant (even if no actual sale or distribution occurred), as Penuma was advertised on the website. Defendants' alternative request for a new trial is unsupported by any evidence that clearly weighs against the jury verdict on this claim. Accordingly, the Court denies the Motion as to the counterfeit mark claim.

### D. Breach of Contract

Defendants argue that Cornell is entitled to judgment as a matter of law or a new trial on the breach of contract claim because "[e]vidence at trial confirmed that some or all of the trade secrets alleged by Plaintiffs were publicly available, already known by Dr. Cornell, or otherwise generally known," and that therefore the information was not confidential "under the definition in the NDA." (Mot. at 26.)

As explained above, there was evidence in the record that Defendants misappropriated the four trade secrets, which necessarily also showed that the trade secrets were not generally known. The same evidence indicated that Cornell breached the NDA. Judgment as a matter of law on this claim is not warranted. The evidence similarly supports the jury verdict and a new trial is not warranted. Accordingly, the Court denies the Motion as to the breach of contract claim.

### E. Patent Invalidation

Defendants contend that Plaintiffs failed to prove the elements of their patent invalidity claims "by clear and convincing evidence" because there was no evidence the trade secrets "constituted the 'significant inventive' aspects of" the Augmenta

---

advertisement "was in anticipation of being credentialed to provide this product"); Ex. 24 (image of the website for Robert J. Cornell, M.D., PA advertising Cornell as a "Penuma Penile Enhancement Specialist"); Ex. 25 (June 25, 2018 cease-and-desist email from Jonathan Elist to Cornell); Ex. 511 (August 4-6, 2024 email correspondence between Jonathan Elist and Cornell regarding Elist "receiving some confusing inquiries from potential patients about Penuma being offered at your clinic" and Cornell confirming he would "request that" his marketing team "completely remove" references to Penuma).)

13

patents. (Reply at 11.) Defendants contend that the significant element in the '413 Patent was varying the pockets along the implant to achieve a gradient of elasticity, as described in Claim 1 of the patent. (*Id*. at 12 (citing to Ex. 29, the '413 Patent).) But evidence in the record indicates that the trade secrets at issue significantly contributed to other claims in the patents.[19] The "clear weight" of this evidence does not indicate that the jury verdict on patent invalidity was wrong. Accordingly, neither judgment as a matter of law nor a new trial are warranted on this basis. The Court denies the Motion as to the patent invalidity claims.

### F.  New Trial Based on Claim Construction Question

Defendants argue that because "[m]uch of the dispute in this case concerned the meaning of the Augmenta patent and various prior-art patents and the Court "never construed the claims," the Court "erroneously treat[ed] the meaning of the claims as a question of fact for the jury (and a subject for expert testimony). (*Id*.) Plaintiffs argue that Defendants waived any claim construction argument because they raised no such objections previously, and in fact "consistently took the position the jury must decide . . . who invented the claims of [the patents]." (Opp. at 25–26.)[20]

Defendants previously did not object to the lack of claim construction, and in fact took the position that these issues should be decided by the jury. They cannot

---

[19] (*See* Trial Tr. at 328:15-23, 334:16-335:4 (Dr. Elist testified that he conceived of the use of internal pockets to make Penuma softer and more flexible); 335:11-337:1 (Dr. Elist planned to incorporate mesh at or around the distal tip to secure the implant in place, which could be used in combination with absorbable sutures); 1789:21-1791:11 (Defendants used the design concept trade secrets Cornell obtained during the Penuma training to obtain the '413 Patent and the '639 Patent); Exs. 29, 78 (Claims 1-10 of the '413 Patent and claims 1, and 13-17 of the '639 Patent based on Plaintiffs' internal pockets concept); Ex. 29 (Claims 11-15 of the '413 Patent based on Plaintiffs' design concepts for mesh tabs and absorbable sutures).)

[20] Plaintiffs also note that "Defendants argued in a bench brief that 'the question of inventorship must be submitted to the jury under the Seventh Amendment.'" (*Id*.)

14

now argue the opposite. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position"). In any case, "the determination of secrecy under the UTSA is not the same as the PTO's decision whether an invention is obvious in view of the prior art," and this question of whether patent applications or prior art made information generally known is a "fact-intensive question" for the jury. *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012). Accordingly, the Court denies the Motion for a new trial on this ground.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

DATED: March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE